Argued and submitted October 2, 1979, reversed January 2, 1980

# MEGDAL,
*Petitioner,*
*v.*
# OREGON STATE BOARD OF
DENTAL EXAMINERS,
*Respondent.*

(CA 9772, SC 26120)

605 P2d 273

John R. Faust, Jr., of Hardy, McEwen, Newman, Faust & Hanna, Portland, argued the cause for petitioner. Donald W. McEwen on the brief.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General.

LINDE, J.

Denecke, C.J., specially concurring opinion.

**LINDE, J.**

Petitioner, a dentist licensed both in Oregon and in California and maintaining offices in both states, seeks review of an order of the State Board of Dental Examiners which revoked his Oregon license on the ground of "unprofessional conduct." ORS 679.140(1)(c) and (5)(d).

The conduct which the board found unprofessional under the statute was that petitioner obtained malpractice insurance coverage for other dentists employed by him in his California practice by a misrepresentation that they were employed in Oregon. Briefly stated, the board found that petitioner had requested this coverage from his insurance brokers on his Grants Pass, Oregon, letterhead, that thereafter he had his California employees submit application forms on which a line asking for their office address had been cancelled out or left blank, purposely leaving the impression that the applicants were employed in Grants Pass, and that upon this misrepresentation the insurance carrier, to its damage, provided liability coverage which it otherwise would not have provided. The issue, in sum, is whether the board may revoke a dentist's license under an unparticularized rubric of "unprofessional conduct" upon an administrative finding that he practiced a fraud on an insurance company.

Petitioner objects that before revoking a license for unprofessional conduct other than the kinds specified in the statute itself the board must first adopt rules indicating the forbidden conduct, because the phrase "unprofessional conduct" alone is too vague a standard to be applied directly from case to case.

A similar claim by a physician licensed under another statute was rejected by this court in *Board of Medical Examiners v. Mintz,* 233 Or 441, 378 P2d 945 (1963), a decision later followed in the case of a nurse in *Ward v. Ore. State Bd. of Nursing,* 266 Or 128, 510

P2d 554, 55 ALR3d 1134 (1973). Nevertheless, the Court of Appeals was troubled by the problem posed by forbidding a skilled or professional person, once found qualified, to practice his or her occupation on essentially ad hoc determinations of "unprofessional conduct." The panel which first heard this case, with one dissent, distinguished the *Mintz* and *Ward* precedents because the unprofessional conduct in those cases was an "inchoate" form of conduct expressly proscribed by the governing statutes, and it concluded that prior rulemaking was required to proscribe other conduct that bears no such relationship to the statute. 37 Or App 219, 586 P2d 816 (1978). However, on reconsideration *en banc* the court decided that petitioner's challenge to the statutory standard was foreclosed by this court's holding in *Board of Medical Examiners v. Mintz, supra,* and that the demand for prior rulemaking had not been properly presented; it therefore affirmed the board's order. 38 Or App 469, 590 P2d 745 (1979).[1] We allowed review in order to reexamine the role of broadly stated standards in laws governing disciplinary actions against occupational licensees. For the reasons that follow, we conclude that the board's order must be reversed.

### 1. *Petitioner's constitutional claim.*

Petitioner begins his brief in the Court of Appeals with a constitutional attack on the statutory phrase "unprofessional conduct." The attack is as unspecific as its target. We have had previous occasion to point out that constitutional claims should identify the provisions of the constitution, state and federal, that the governmental action is said to contravene and should show the relevance of these provisions to the claim. *See, e.g., Rogers v. Department of Revenue,* 284 Or 409, 412 n. 2, 587 P2d 91 (1978). Petitioner's brief cites no clause of either constitution for his assertion that

---

[1] Because of this reconsideration, the Court of Appeals also reached and rejected petitioner's claims that the board's findings were not supported by substantial evidence and that revocation of petitioner's license was an unreasonable sanction.

"unprofessional conduct" is so vague as to be "constitutionally impermissible." Possibly the seductive alliteration "void for vagueness" is thought to have achieved constitutional status on its own, judging by how often it is invoked. Actually, "vagueness" in a statute, ordinance, regulation, decree, order, or other legal rule is a fault for reasons which differ with the function of the rule at issue, and which must search for footing in still unsettled constitutional premises. But since the constitutional claim in this case, though unspecific, is not frivolous and addresses a significant problem, and since our duty is to credit the lawmaker with intending to act constitutionally,[2] we briefly examine its possible merits.

An initial distinction is whether "unprofessional conduct" is attacked as inadequate to guide the Board of Dental Examiners or as inadequate to inform dentists of the conduct expected under their license.

Often very broad terms, even broader than "unprofessional conduct," are employed in laws that assign an agency responsibility for managing a program or pursuing a policy whose goals the law indicates only in the most general sense. As recently stated in *Anderson v. Peden,* 284 Or 313, 587 P2d 59 (1978), the constitutional issue in such broad delegations of authority is only whether it remains possible for the agency and for reviewing courts to determine when subsequent agency rules or actions have honored and when they have departed from the general policy indicated by the politically accountable lawmaker.[3] So much necessarily follows from the assignment of the legislative power

---

[2] *Carden v. Johnson,* 282 Or 169, 174-177, 577 P2d 513 (1978); *Oregon Medical Association v. Rawls,* 281 Or 293, 300, 574 P2d 1103 (1978), and cases there cited.

[3]

"The issue . . . [is] whether the lawmaker's political responsibility for choosing at least the general direction of public policy among competing alternatives has been abdicated without guidance to administrative officials. It is an issue of the constitutional allocation of powers, not of procedural fairness to particular persons. While it must
*(Continued on following page)*

to the Legislative Assembly (when not exercised directly by the people or by local home rule) and its denial to the other departments. Or Const art IV, § 1; art III, § 1. But almost always scrutiny of the grant of authority will turn this necessary determination into a question of interpreting the agency's assignment rather than of invalidating the delegation for vagueness. Beyond doubt "unprofessional conduct" is constitutionally adequate as a directive giving the board authority to prescribe standards under which its licensees will be subject to professional discipline.

It is another question whether "unprofessional conduct" is adequate by itself as a standard for deciding individual cases. It involves additional considerations which are reflected in different constitutional premises. In criminal cases, one concern about overly general or vague penal laws is that they not only allow a court or a jury to define a crime but to do so after the fact, contrary to article I, section 21 of the constitution. *See State v. Blair,* 287 Or 519, 601 P2d 766 (1979), quoting from *State v. Hodges,* 254 Or 21, 457 P2d 491 (1969).[4] The second concern is that such laws do not

---

*(Continued from previous page)*
always be possible to determine what rules can fairly be said to carry out the policy of the delegating legislation under which they are made, such legislation is not unconstitutional merely because the terms of the legislative directive are general and vague."

284 Or at 325. This statement continued by indicating that broad delegation of policymaking was least vulnerable when it was given "to an elected local government that itself had political accountability for lawmaking as well as administration." *Cf. Warren v. Marion County,* 222 Or 307, 353 P2d 257 (1960).

[4] Or Const art I, § 21:
    "No *ex post facto* law . . . shall ever be passed, . . ."
"A law that permits the judge and jury to punish or withhold punishment in their uncontrolled discretion is defective as much for its uncertainty of adjudication as for its failure to notify potential defendants of its scope and reach.
    ". . . A vague statute lends itself to an unconstitutional delegation of legislative power to the judge and jury, and, by permitting the jury to decide what the law will be, it offends the principle, if not the rule, against *ex post facto* laws. See Oregon Constitution, Art I, § 21."

254 Or at 27.

give fair notice of what they proscribe in time to let a person conform to the law, so that the imposition of punishment deprives him of liberty or property without due process of law under the fourteenth amendment. *See State v. Hodges, supra; Lanzetta v. New Jersey,* 306 US 451, 59 S Ct 618, 83 L Ed 888 (1939). As a premise for a requirement of due process, the right to notice of the law has its own problems.[5] But in any event this principle, like that against *ex post facto* laws, is generally confined to penal sanctions. No one familiar with the common law expects due process to preserve one either from indefinite standards or from their delegation to juries or judges in civil cases, though one may stand to lose far more than under many criminal laws. *See Anderson v. Peden, supra,* 284 Or at 324.

We may assume that petitioner could not be prosecuted for a statutory crime described only as "unprofessional conduct." But the same premises do not obviously apply to a revocation of his professional license under that standard. If loss of the right to practice one's profession were employed as a form of punishment for delinquencies apart from safeguarding prop-

[5] The problems include such questions as whether the coverage of a statute must be discernible to one who reads it with general knowledge of its subject matter or may be supplied by a saving judicial construction, whether a concededly vague statute may validly be enforced against one whose conduct falls squarely within even the narrowest reading of the prohibition, and whether a defendant's specific intent to violate the law can replace his right to notice of the forbidden conduct. Many of the Supreme Court's decisions involve laws that arguably infringe first amendment rights. *See* LaFave and Scott, Criminal Law 89 (1972) and cases cited. Once these are set to one side as presenting a special problem, the Court's answers to the foregoing questions are none too clear. *See, e.g., Papachristou v. City of Jacksonville,* 405 US 156, 92 S Ct 839, 31 L Ed 2d 110 (1972); *Boyce Motor Lines v. United States,* 342 US 337, 72 S Ct 329, 96 L Ed 367 (1952); *Williams v. United States,* 341 US 97, 101-112, 71 S Ct 576, 95 L Ed 774 (1951); *Screws v. United States,* 325 US 91, 65 S Ct 1031, 89 L Ed 1495 (1945); *Lanzetta v. New Jersey, supra; Smith v. Cahoon,* 283 US 553, 564-565, 51 S Ct 582, 75 L Ed 1264 (1931); *Connally v. General Const. Co.,* 269 US 385, 391-392, 46 S Ct 126, 70 L Ed 322 (1926); *and see generally* Todd, *Vagueness Doctrine in the Federal Courts,* 26 Stan L Rev 855 (1974); Note, *The Void-For-Vagueness Doctrine in the Supreme Court,* 109 U Pa L Rev 67 (1960); Note, 26 Minn L Rev 661 (1942).

er performance in the professional role, the implications would go beyond the adequacy of the standard to issues of criminal procedure generally, *see Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 100, 105, 570 P2d 52 (1977) and *cf. Dickinson v. Davis,* 277 Or 665, 670-671, 561 P2d 1019 (1977), if indeed its use for punishment would be constitutional at all. *Cf. Ex Parte A. H. Garland,* 71 US (4 Wall.) 333, 18 L Ed 366 (1867) (invalidating the disqualification of former Confederate supporters from law practice in federal courts). No doubt the disqualified person's loss is equally grave whether it is inflicted as punishment for wrongdoing or as enforcement of professional discipline. But we have no reason to attribute the former rather than the latter objective to laws that allow disqualification for unprofessional conduct. Petitioner cannot rest a constitutional attack on ORS 679.140 on the decisions that hold penal laws unenforceable for vagueness.

In common parlance a claimed denial of due process of law may intend simply a claim of illegality, of failure to follow what the claimant asserts to be the law. But when a state law is attacked for failure to provide due process, we are in the realm of the fourteenth amendment, where guidance must be found in the decisions of the United States Supreme Court.[6] Such an attack depends not on our own views but, rather, on the premise that if a state law explicitly directed a board to apply "unprofessional conduct" case by case in disciplinary proceedings, the Supreme Court would reverse the revocation of an occupational license without prior specification of standards as a deprivation of liberty or property without due process of law.

There is no lack of suggestion that a prior specification of grounds should be a prerequisite of due process

---

[6] US Const amend 14, § 1:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law; . . ."

in administrative as well as penal deprivations. *See, e.g.,* Davis, Administrative Law of the Seventies 28, 224 (1976); Note, *Due Process Limitations on Occupational Licensing,* 59 Va L Rev 1097, 1104-1106 (1973).[7] At least one modern court has held that the grounds to revoke a pharmacist's license for "grossly unprofessional conduct" must be limited to those further spelled out in the statute or in rules, because "revocation of licenses and permits for conduct not specifically defined or prohibited by the statute, would render the statute unconstitutional on grounds of vagueness in violation of the Due Process Clause of the Fourteenth Amendment." *Pennsylvania State Board of Pharmacy v. Cohen,* 448 Pa 189, 292 A2d 277, 282 (1972). To support this conclusion the court took the step of tacking together the two propositions that an individual's exclusion from an occupation requires due process and that penal statutes must give adequate notice of the forbidden or required conduct:

> "Given the critical consequences including 'the loss of professional standing, professional reputation, and of livelihood . . .', Spevack v. Klein, 385 U.S. 511, 516, 87 S.Ct. 625, 628 (1967), attending the suspension or revocation of a pharmacist's license and permit, there can be no doubt that the imposition of sanctions under section 390-5 must satisfy the requirements of notice and clear description of what is prohibited

---

[7] The Note also quotes a respected judge's view:

"As an abstract proposition, few would argue that these requirements [to have one's conduct governed by rules which are clearly formulated and publicly promulgated] are limited to the areas of criminal law and constitutional rights. . . . [I]magine a system under which a man's right to pursue his chosen occupation depends upon his ability to get approval from a board which gives no hint of when it will give such approval and when it will withhold it. Is it really open to question that such schemes would be unconstitutional? Regulatory systems which operate without rules are inherently irrational and arbitrary. The purpose of such a system is presumably to bring primary conduct into conformance with agreed upon societal norms. Yet a system operating without rules cannot possibly achieve this goal, since the people being regulated are not informed of what the societal norms are."

59 Va L Rev at 1104-1105, quoting Wright, *Book Review,* 81 Yale L J 575, 589 (1972). But this was an extrajudicial view.

conduct imposed on all penal statutes by the Fourteenth Amendment. . . ."

292 A2d at 282.

Perhaps federal "due process" law will move toward the step anticipated by the Pennsylvania court.[8] But, contrary to the sentence last quoted, there has been no clear signal from the United States Supreme Court that the standards for occupational licensing decisions must meet those for penal laws. The Court's later holdings sustaining the adequacy of phrases such as "conduct unbecoming an officer and a gentleman" for military punishment, *Parker v. Levy,* 417 US 733, 94 S Ct 2547, 40 L Ed 2d 439 (1974) and a string of epithets[9] for disciplinary discharge of civil service employees, *Arnett v. Kennedy,* 416 US 134, 94 S Ct 1633, 41 L Ed 2d 15 (1974), can be distinguished as dealing with special relationships. Nonetheless, the gravity of the losses there permitted to be inflicted under vague standards leaves the crucial step assumed by the Pennsylvania court in doubt. Again, the factors from which *Mathews v. Eldridge,* 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976), directs us to derive the requirements of due process—the private interest affected, the chances of error and of its reduction by better procedures, and the countervailing governmental interests—clearly affirm a licensee's right to the kind of adjudicatory procedures of notice, hearing, and findings based on evidence that, in this state, are provided him under the administrative procedure act;[10] but

[8] The Pennsylvania court claimed only to follow decisions of the United States Supreme Court under the fourteenth amendment, not the Pennsylvania Constitution, *e.g.,* Pa Const, art I, § 9.

[9] The statutory phrase was "efficiency of the service"; Civil Service Commission regulations added "criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government," and "any action . . . which might result in, or create the appearance of . . . [a]ffecting adversely the confidence of the public in the integrity of the Government." 5 USC § 7501(a), 5 CFR §§ 735.201a, 735.209, quoted 416 US at 140-142.

[10] ORS ch 183 requires "contested case" procedures whenever "the individual legal rights, duties or privileges of specific parties are required
*(Continued on following page)*

nothing indicates whether this due process calculus extends also to restricting adverse action to the enforcement of previously specified norms. For the moment, at least, support for finding such a requirement in federal due process appears primarily in *Soglin v. Kauffman,* 418 F2d 163 (7th Cir 1969), which applied the requirement to standards for expelling university students for "misconduct," and in decisions involving criteria for the bestowing of benefits.[11]

In sum, the most that can be said about "due process" as a possible premise for petitioner's constitutional attack on the phrase "unprofessional conduct" is that the state of the federal law is inconclusive and the attack perhaps only premature. Nor is the phrase vulnerable under the state constitution as transferring legislative power to the board or as empowering the board to make laws *ex post facto,* since the object of the law is not to punish misconduct as such but to confine the practice of the profession to those who maintain professional standards of conduct. However, to conclude that the law is not unconstitutional does not decide what it means. We turn to that question.

-------

*(Continued from previous page)*

by statute or Constitution to be determined only after an agency hearing at which such specific parties are entitled to appear and be heard". ORS 183.310(2)(a)(A). Irrespective of due process, subsection (2)(a)(C) requires these procedures in any proceeding for the "suspension, revocation or refusal to renew or issue a license where the licensee or applicant for a license demands such hearing".

[11] *Cf. also Holmes v. New York City Housing Authority,* 398 F2d 262 (2d Cir 1968) (selection of applicants for limited number of housing units); *White v. Roughton,* 530 F2d 750 (7th Cir 1976) (eligibility for public assistance). A greater readiness to insist on articulated criteria in the administrative distribution of such benefits than in imposing sanctions, there phrased as a requirement of "due process," in fact may express yet another constitutional concern—a concern about possible favoritism and arbitrariness which in Oregon is expressed in Or Const art I, § 20:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

A similar concern in the context of a license denial was expressed in *Hornsby v. Allen,* 326 F2d 605, 610 (5th Cir 1964).

## 2. *The use of "unprofessional conduct" in ORS 679.140*

On review in this court, petitioner changes emphasis to the question whether the board misapplied the statutory term "unprofessional conduct." He contends that the legislature did not mean "unprofessional conduct" to extend to a dentist's dealings with an insurance company, or at least not without prior rulemaking. The argument combines two claims against the board's application of this phrase in the statute, one substantive and the other procedural.

In theory, the statutory standard "unprofessional conduct" could be intended in one of three ways. The intended meaning will not be found in cases decided under different laws in this or another state. Occupational licensing is not common law but statutory administration. The meaning to be found is what the statute's drafters, if aware of the problem, could readily have made explicit, and what they can change if they so choose.

First, an occupational licensing law might use "unprofessional conduct" to refer to norms of conduct that are uniformly or widely recognized in the particular profession or occupation, apart from the views of the agency itself and in this sense "external" to the law. If this were the intended meaning of the phrase, its application would depend not on interpreting the law or making rules but on finding what the existing standards in fact are.

Second, such a phrase might be intended to express the legislature's own licensing standard, though in very general terms. While its contours might have to be derived from the context and legislative history, its meaning would nevertheless be a question of statutory interpretation, not of external sources, and agency interpretive rulemaking would be confined to providing notice of the agency's view of its proper application. Such an agency interpretation of a broadly stated standard entrusted to it is often entitled to judicial

respect, *see e.g. McPherson v. Employment Division,* 285 Or 541, 591 P2d 1381 (1979). But it remains an interpretation rather than an execution of a legislative assignment to make new rules.

Finally, such a legislative assignment to the agency to make new rules is the third possible role intended for "unprofessional conduct" in the statute. If so, the term itself cannot be applied without prior rulemaking, and the issue on review is whether a given rule remains within the scope of the delegated authority. An example is the rule against advertising that was sustained in *Angelos v. Bd.of Dental Examiners,* 244 Or 1, 414 P2d 335 (1966), and *compare Ore. Newspaper Pub. v. Peterson,* 244 Or 116, 415 P2d 21 (1966).

*Board of Medical Examiners v. Mintz, supra,* proceeded on the premise that the legislature, in enacting the statute involved there, meant the general standard of "unprofessional or dishonorable conduct" in the first of the three ways mentioned above, as a reference to standards recognized in the profession external to the board itself. The question seems not to have been made a central issue in the case. The statute defined "unprofessional or dishonorable conduct" as "conduct unbecoming a person licensed to practice medicine or detrimental to the best interest of the public," and the dispute centered on the vagueness of this standard rather than on the proper source from which to give it substance. With its focus on the vagueness issue, the court followed a New York decision which treated "unprofessional conduct" as referring to "the standards of conduct generally accepted by practitioners in the State of New York" and held that these standards were "not so indefinite that they cannot be determined by qualified persons." *Matter of Bell v. Board of Regents,* 295 NY 101, 110, 65 NE2d 184, 189 (1946), quoted in 233 Or at 446-447. Accordingly, the court in *Mintz* continued:

> "The board's discretion is not without controls. As was noted above, the standards are those which are

accepted by the practitioners in the community. The standard must be ascertained through expert opinion; except where the standard is clear as it is in the present case. [The charge against Mintz was that he administered drugs for the purpose of performing an abortion, which fell short of an express proscription of the statute.] Conceding that the charge is so limited, we are of the opinion that the conduct described is of such a nature that the board was warranted in regarding it as a violation of medical ethics and that it was not necessary to elicit expert opinion outside of the board to support the conclusion."

233 Or at 448-449. The court later followed the same approach in holding that expert testimony was not needed to establish that a nurse who aided another in violating an express proscription of the licensing statute was herself guilty of "conduct derogatory to the standards of professional nursing." *Ward v. Ore. State Bd. of Nursing, supra.*

We hold to the view that expert testimony is not the proper source for determining the governing standards of "unprofessional conduct," but we do so for somewhat different reasons. *Mintz* and *Ward* started from the assumption that the board's task was to determine what the standards of the profession in fact were. Taking this assumption to its logical conclusion, such determinations would presumably have the character of findings, required by ORS 183.470, which would have to be supported by substantial evidence in the record unless the conduct was deemed so clearly unprofessional, as in *Mintz* and *Ward,* as to be a matter of official notice under ORS 183.450(4). But upon further reflection, we think that when the legislative assembly delegated authority over professional standards to the Board of Dental Examiners, it intended the board to exercise responsibility for those standards itself rather than to look to private practitioners or associations in order to determine what their standards are.

[306].

To view the statute as incorporating external professional standards by reference creates needless difficulties. It poses a question whether authority to impose rules, enforced by governmental power to grant or revoke licenses, has been delegated to private associations. *See Hillman v. North. Wasco Co. PUD,* 213 Or 264, 323 P2d 664 (1958). Licensing statutes are a form of public regulation, not organized self-regulation. Although generally members of the regulated occupations are appointed to licensing boards, they are agencies of the government, not representatives of a guild.[12] Their responsibilities are not to their own occupational groups but to the public. *Cf. Marbet v. Portland Gen. Elect.,* 277 Or 447, 469-470, 561 P2d 154 (1977).

Nor may a board proceed on the assumption today, if it ever could, that all members of the profession should be expected to share unarticulated understandings about professional manners and mores because they were drawn from a few homogeneous ethnic, religious and social origins. And to view the profession's attitude toward particular conduct as a factual issue for decision in disciplinary proceedings might well lead to contradictory results depending on the evidence put in the record on that issue. A decision that Dr. A's conduct was shown to be contrary to prevailing professional standards would not mean that Dr. B's identical conduct might not be shown, on different evidence, to be consistent with prevailing professional standards. We doubt that this is the legislative intent. Indeed, the statute is not wholly silent on

[12] Many statutes provide that occupational associations may recommend persons to the governor for appointment to an occupational licensing board, but since the governor remains free to make other appointments and therefore politically responsible for them, the statutes escape the charge of delegating governmental power to the occupational groups. *See, e.g.,* ORS 675.310 (Occupational Therapy Licensing Board); ORS 677.235(1) (Board of Medical Examiners); ORS 678.800 (Board of Examiners of Nursing Home Administrators); ORS 679.230 (Board of Dental Examiners); ORS 682.150 (Board of Podiatry Examiners); ORS 686.210(1) (Veterinary Medical Examining Board); ORS 688.160 (Physical Therapist Licensing Board); ORS 689.540 (Board of Pharmacy). The exceptions are nurses, ORS 678.140, and audiologists, ORS 681.400.

the question. Along with "unprofessional conduct," ORS 679.140(1)(c) lists "gross ignorance, incompetence or inefficiency" as grounds for disciplinary action. Subsection (4) of the same section states that in determining what constitutes "gross ignorance, incompetence or inefficiency" the board may take into account such sources as the practices generally followed and accepted by practitioners, current teaching at dental schools, and technical reports.[13] In this subsection the legislature has itself stated that substandard levels of skill and performance may result in disqualification and that these may be measured against the stated sources among others. If rules are promulgated only to indicate that particular skills or practices are considered essential for competence or efficiency, they are interpretive rules. *Cf. McPherson v. Employment Division, supra,* 285 Or at 551.

However, this subsection makes no such reference for determining what constitutes "unprofessional conduct." While current standards of scientific knowledge and of safe and effective technique in a profession or craft may be determinable from such sources, disputed ethical standards often are more an issue of policy and values than of the state of the art. So, at least, the legislature may have thought. No doubt the views of members of the profession itself on standards of professional conduct nevertheless are entitled to weight when the board adopts rules to give content to a general standard under the statute. *Cf. Morra v. State Board of Examiners of Psychologists,* 212 Kan 103, 510 P2d 614 (1973) (professional association's code of

---

[13] ORS 679.140(4):

"In determining what constitutes 'gross ignorance, incompetence or inefficiency in his profession' within the meaning of paragraph (c) of subsection (1) of this section, the board may take into account all relevant factors and practices, including but not limited to the practices generally and currently followed and accepted by persons licensed to practice dentistry in this state, the current teachings at accredited dental schools, relevant technical reports published in recognized dental journals and the desirability of reasonable experimentation in the furtherance of the dental arts."

[308]

ethics not applied before adoption by board rule). So, for that matter, are the views of others potentially affected by the conduct in question. But responsibility for the statutory standard and its application rests with the board.

Petitioner claims that the meaning of "unprofessional conduct" by dentists was narrowed by amendments of ORS 679.140 adopted after the 1963 decision in *Board of Medical Examiners v. Mintz, supra.* Like his constitutional claim, this claim is not explained. The history of ORS 679.140 appears to the contrary. Before 1963, the statute provided, apart from other grounds for suspending or revoking a license, that "[u]nprofessional conduct means" any of a list of 12 specified practices, mostly though not exclusively concerned with solicitation and advertising. ORS 679.140(2) (1961). The use of the word "means" clearly was designed to limit "unprofessional conduct" to the specified acts. In 1963, after the decision in *Mintz,* the legislature amended the section to read: "Unprofessional conduct as used in this chapter includes but is not limited to" essentially the same list of practices.[14] The term remains "not limited to" the listed practices, which now have added a contemporary concern with narcotics to the old preoccupation with advertising.[15]

---

[14] The executive secretary of the Board of Dental Examiners, testifying for the board in support of the 1963 amendments, said with respect to the present issue only that the proposal "clarifies the acts for which a dentist may have a license suspended or revoked, and expands the same in several minor areas." A purpose to "clarify" the standard of "unprofessional conduct" does not suggest an intention to open the standard to ad hoc application without prior rulemaking.

*See also Campbell v. Henderson,* 241 Or 75, 403 P2d 902 (1965), for a discussion of this statutory change and of the distinction between rules interpreting the old text and rules adding new specifications. In *Campbell* the court declined to declare whether the disputed rules were valid because the statute had subsequently been amended.

[15] At the time of the hearing, ORS 679.140 provided:

"(1) The board may discipline as provided in this section any person licensed to practice dentistry in this state for any of the following causes:

*(Continued on following page)*

*(Continued from previous page)*

"(a)   Conviction of any offense for which the court could impose a punishment of imprisonment in a state or federal penal institution if the board makes the finding required by ORS 670.280. The record of conviction or a certified copy thereof, certified by the clerk of the court or by the judge in whose court the conviction is entered, is conclusive evidence of the conviction.

"(b)   Renting or loaning to any person his license or diploma to be used as a license or diploma of such person.

"(c)   Unprofessional conduct, or for gross ignorance, incompetence or inefficiency in his profession.

"(d)   Any violation of ORS 679.170 or 679.176.

"(2)   Unprofessional conduct as used in this chapter includes but is not limited to the following:

"(a)   Employing what are known as 'cappers' or 'steerers' to obtain business.

"(b)   Obtaining any fee by fraud or misrepresentation.

''(c)   Wilfully betraying confidences involved in the patient-dentist relationship.

"(d)   Employing, aiding, abetting or permitting any unlicensed personnel to practice dentistry.

"(e)   Making use of any advertising statements of a character tending to deceive or mislead the public, or which are untruthful.

"(f)   Advertising professional superiority or the performance of professional services in a superior manner.

"(g)   Advertising prices for professional service, unless in accord with rules developed by the board.

"(h)   Advertising by means of large display, glaring light signs, or advertising containing as a part thereof the representation of a tooth, teeth, bridgework or any portion of the human head.

"(i)   Employing or making use of advertising solicitors or publicity press agents.

"(j)   Advertising any free dental work or free examination.

"(k)   Advertising to guarantee any dental service, or to perform any dental operation painlessly.

''(L)   Advertising which makes reference to any anesthetic, drug, formula, material, medicine, method or system to be used in treatment.

"(m)   Advertising extractions, artificial teeth or dentures.

"(n)   Habitual or excessive use of intoxicants or a controlled substance as defined under ORS 161.705, 167.203 to 167.247, 181.010, 430.325, 430.405, 471.665, 475.005 to 475.285, 475.992 to 475.995, 483.710, 680.100, 689.290, 689.410, 689.620 and this section.

*(Continued on following page)*

[310]

Plainly the significant change made after *Mintz* was to authorize the board to expand the reach of "unprofessional conduct" rather than to confine it. But how was the board to do this?

Since 1939 the statute has authorized the board to "make and enforce rules . . . for regulating the practice of dentistry." ORS 679.250(7).[16] The statute does not expressly state that the expanded grounds for disciplinary action under the rubric "unprofessional conduct" were to be created by board rules. But there are reasons to believe that this is the legislative policy. One is that the legislature should not be assumed to be insensitive to the importance of fair notice of grounds that may lead to loss of one's profession or occupation, whether or not this is a constitutional requirement. More concretely, the legislature made this policy explicit in many similar licensing statutes even if not in this one. Chapter 679 is one of more than 30 such

---

*(Continued from previous page)*

"(o) Obtaining or attempting to obtain a narcotic drug or a dangerous drug, as previously defined in this section, in any manner proscribed by the rules of the board.

"(p) Prescribing or dispensing drugs outside the scope of the practice of dentistry.

"(q) Using, in any advertisement, a portrait cut, photograph or reproduced likeness which is more than five years old of the dentist so advertising.

"(3) The proceedings under this section and ORS 679.150 may be taken by the board from the matters within its knowledge, or may be taken upon the information of another, but if the informant is a member of the board, the other members of the board shall constitute the board for the purpose of finding judgment of the accused."

ORS 679.170, referred to in ORS 679.140(1)(d), prohibits various fraudulent uses of false names or academic records. ORS 679.176 requires written work orders for technical work.

ORS 679.140 was revised in 1979, OL 1979, ch 142, § 1; ch 744, §§ 53, 53(a).

[16] A sentence added as part of the 1963 amendments, which directs the board in adopting rules to consider "the practices generally and currently followed and accepted" by practitioners as well as certain other sources, might make it appear as if these rules were thought primarily to concern techniques of dentistry. But we do not think this addition was meant to narrow the prior scope of the board's rulemaking authority to these subjects.

statutes brought together in ORS chapters 670 - 703. Repeatedly the legislature has specified that the several boards are to exercise their control over professional standards by adopting codes or rules. Thus the State Board of Architect Examiners is authorized to "promulgate reasonable rules prescribing standards of professional conduct for architects." ORS 671.125(2). Accountants may be disciplined for violations of "the Code of Professional Conduct adopted by the board." ORS 673.170(4).[17] Similar provisions are made for professional engineers, ORS 672.255(1)(c), geologists, ORS 672.655, psychologists, 675.110(10), occupational therapists, ORS 675.300(1)(a), audiologists, ORS 681.420(5), and tax consultants, ORS 673.730(6). Other licensing statutes simply give the licensing board general rulemaking authority.[18] The drafters' usage has not been consistent. The Board of Dental Examiners, respondents in the present case, itself is directed to specify "by rule or regulation . . . what constitutes unprofessional conduct, gross ignorance, incompetence or inefficiency" for dental hygienists or other dental assistants, ORS 680.100(1)(d), while its rulemaking authority for dentists is phrased in general terms. ORS 679.250(7).

---

[17] The pertinent text of ORS 673.170 provides:

"The board may revoke or suspend any certificate issued under ORS 673.040 to 673.080, or any registration or license granted under ORS 58.345 or 673.090 to 673.140 or section 16 or 20, chapter 381, Oregon Laws 1951, or may revoke, suspend or refuse to renew any permit issued under ORS 673.150, or may censure the holder of any such permit, for any one or any combination of the following causes:

. . . .

"(4) Violation of any provision of the Code of Professional Conduct adopted by the board under the authority granted by ORS 673.010 to 673.480 after written warning by the board that such a violation would constitute grounds for proceedings under this section."

Interestingly, no such authority as there mentioned appears elsewhere in ORS 673.010 - 673.480.

[18] *See* ORS 671.670 (landscape contractors); ORS 678.820 (nursing home administrators); ORS 682.160 (podiatrists); ORS 684.155(1)(b) (chiropractors); ORS 689.620(2) (pharmacists); ORS 698.730(1) (auctioneers). Still other statutes do not refer to rulemaking authority or to disciplinary action for rule violations.

Sometimes such differences in statutory drafting represent deliberate differences in policy. We see no reason to believe that this was the case here.[19] The difference of the potential impact, when one occupation is given fair notice of obligatory standards of propriety by prior rulemaking and another occupation is given no such prior notice, is too pronounced to be attributed to the legislature without some showing that it was intended. Thus we doubt that the stylistic differences among 30-odd statutes separately enacted over many years mean that some of the boards are to develop professional standards by rulemaking and others by ad hoc determinations, insofar as they are authorized to add to the express statutory grounds for discipline at all. Rather, we infer from statutes such as those cited above that when a licensing statute contains both a broad standard of "unprofessional conduct" that is not fully defined in the statute itself and also authority to make rules for the conduct of the

---

[19] As Justice Frankfurter once put it in deciding whether Congress intended a governmental corporation to be immune from suit:

"The Congressional will must be divined, and by a process of interpretation which, in effect, is the ascertainment of policy immanent not merely in the single statute from which flow the rights and responsibilities of Regional, but in a series of statutes utilizing corporations for governmental purposes and drawing significance from dominant contemporaneous opinion regarding the immunity of governmental agencies from suit.

". . . In spawning these corporations during the past two decades, Congress has uniformly included amenability to law. . . . Such a firm practice is partly an indication of the present climate of opinion which has brought governmental immunity from suit into disfavor, partly it reveals a definite attitude on the part of Congress which should be given hospitable scope. . . .

. . . .

"To give Regional an immunity denied to more than two score corporations, each designed for a purpose of government not relevantly different from that which occasioned the creation of Regional, is to impute to Congress a desire for incoherence in a body of affiliated enactments and for drastic legal differentiation where policy justifies none. . . . "

*Keifer & Keifer v. Reconstruction Finance Corp.,* 306 US 381, 389-391, 394, 59 S Ct 516, 83 L Ed 784 (1939).

regulated occupation, the legislative purpose is to provide for the further specification of the standard by rules, unless a different understanding is shown. When such a rule purports to be an interpretation of one of the more specific proscriptions or requirements stated in the statute itself, it is reviewable as an interpretation. *See McPherson v. Employment Division, supra; Angelos v. Bd. of Dental Examiners, supra,* 244 Or at 5-6. When a board lays down a new rule of proscribed or required conduct under delegated authority to do so, this is reviewable to determine whether the rule remains within the intended scope and purpose of the delegated authority. *See Ore. Newspaper Pub. v. Peterson, supra,* and *cf. Neuhaus v. Federico,* 12 Or App 314, 505 P2d 939 (1973). The administrative procedure act makes compliance with rulemaking procedure reviewable in either case. ORS 183.310(7), 183.335, 183.400.

Doubts are sometimes expressed whether rules can encompass the variety of acts that should be recognized as "unprofessional," or "unethical," or "unbecoming," or otherwise improper. An attempt to "catalogue all the types of professional misconduct" might well seem infeasible, as the court said in *Board of Medical Examiners v. Mintz, supra,* 233 Or at 448. But rules need not imitate a detailed criminal code to serve the two purposes of giving notice of censurable conduct and confining disciplinary administration to the announced standards.[20] Nor is the only alternative to include some form of catchall clause that is as general as the standard it purports to elucidate. The resources of rulemaking are not so limited.

For instance, as this case illustrates, an important question is what relationships are covered by the term "unprofessional conduct" and thus within the range of professional discipline. It might be agreed that the

---

[20] Thus we do not in this case need to reexamine the actual holdings of *Mintz* and *Ward, supra,* that an offer or an attempt to perform expressly proscribed unprofessional acts or to assist another in doing so could be treated as an inchoate violation of the statute.

term covers conduct in the course of rendering the professional service on the one hand, and on the other that it excludes the licensee's purely private affairs unrelated to any relevant professional qualification or performance. But between these two poles, there may be questions how far "unprofessional conduct" extends to financial arrangements or to mixing professional with other relationships. There may be disagreement whether the term should extend beyond conduct toward the patient or other recipient of the regulated service so as to cover relationships with employees or suppliers, with other professionals, or perhaps with the regulating agency itself. As stated above, in many licensing statutes the legislature does not itself provide explicit or implicit answers to these and similar questions; it delegates this task, within the limits of each statute's objectives, to the licensing agencies. The answers might well differ in one occupational setting from another. They may change within the same occupation over time, as has occurred in the very issue in *Mintz*, the issue of abortions. Thus, when the statute itself offers no further definition, the legislative delegation to the agency calls for such questions to be resolved in principle by rules rather than being confronted and disputed for the first time in charging a particular respondent directly under a conclusory term such as "unprofessional conduct."

Petitioner contends that his dealings with the insurance company in this case could not in any event be brought within the range of the legislative standard "unprofessional conduct" because it is too unlike the other types of "unprofessional conduct" proscribed in ORS 679.140(2)(a) - (q), for which he invokes the Latin phrase *ejusdem generis.* The argument is that the listed practices all relate directly to the dentist-patient relationship or to the dentist's physical or mental qualifications. If this were so, or if the statute authorized only interpretive rulemaking under the term "unprofessional conduct," the conclusion might follow. But we do not find all the specific proscriptions to be so

limited. As stated above, more of them dealt with advertising than with any other subject, and while advertising is indeed addressed to potential patients, the restrictions do not seem designed exclusively to protect their interests.[21] Nor is it evident that the rules on obtaining drugs are limited to the dentist-patient relationship.[22] We do not mean that "unprofessional conduct" necessarily extends further. But we are not prepared to hold that the board's power to make rules for ethical conduct in the practice of the profession is narrowly limited to the dentist's relationship with a patient. Besides, it would not be farfetched to recognize a concern of patients in a dentist's fraudulent application for malpractice insurance which, in case of need, might not be available without litigation.

### 3. *The basis for review in this case.*

In summary, we have concluded that ORS 679.140 does not contravene any provision of the state or federal constitution. We have also concluded that when the section was amended to provide that "unprofessional conduct" was no longer limited to the expressly proscribed acts, the legislature did not mean that it had its own conception of what constitutes "unprofessional conduct" which the board was to divine in the form of interpretation, nor did it mean that existing standards of professional conduct were to be determined empirically by taking notice or evidence of prevailing views. Rather it authorized the board to expand the list of conduct deemed unprofessional for disciplinary purposes by rules, without the need to return for legislative amendments. A rule covering fraudulent business practices in the conduct of the

---

[21] *E.g.,* ORS 679.140(2)(g), (h), (L), (m), *supra* note 15. The limitation on nondeceptive advertising may or may not protect a legitimate interest of the profession, but it can be claimed to be protective of patients only in this indirect sense of reducing the pressures of competition on the professional practice.

[22] ORS 679.140(2)(o) proscribed:

"Obtaining or attempting to obtain a narcotic drug or a dangerous drug, as previously defined in this section, in any manner proscribed by the rules of the board."

professional practice would be within the reach of the statutory delegation, but the board made no such rule before proceeding against petitioner. The question is whether petitioner is now entitled to judicial relief.

The proceeding that resulted in the revocation of petitioner's license was a "contested case" under the administrative procedure act, then ORS 183.310(2)(c), *see supra* note 10, and review is governed by ORS 183.482. The statute was in process of revision when the Court of Appeals decided this case. At that time, the relevant parts of ORS 183.482(8) directed the reviewing court to reverse or remand the order only if it found the order to be "unlawful in substance or procedure," or if it found the "statute, rule or order to be unconstitutional." Petitioner did not argue in the Court of Appeals whether the board's failure to adopt rules defining "unprofessional conduct" rendered its revocation of his license "unlawful in substance" or in "procedure" or both, so the court declined to decide that question.[23] The court limited itself to petitioner's constitutional claim, which it rejected.

As amended, ORS 183.482 now provides with respect to the scope of judicial review:

"(7) Review of a contested case shall be confined to the record, the court shall not substitute its judgment for that of the agency as to any issue of fact or agency discretion. . . . The court shall remand the order for further agency action if it finds that either the fairness of the proceedings or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure.

"(8) (a) The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A) Set aside or modify the order; or

---

[23] Although rulemaking to promulgate a substantive standard is a procedure, an order under a standard never promulgated would be unlawful for lack of a substantive predicate, not for error in the revocation procedure.

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(b) The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion delegated to the agency by law:

"(B) Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C) Otherwise in violation of a constitutional or statutory provision.

"(c) The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record."

Oregon Laws 1979, ch 593, § 24. The new version separates a challenge based on material procedural error from a challenge based on misinterpretation or misapplication of the governing law. Under subsection (7), failure to follow prescribed procedure or to do so correctly requires a remand to the agency if the correctness of the action, or irrespective of this, if the fairness of the proceedings may have been impaired by the error. But this refers to procedure in the contested case, for the remand ordered by subsection (7) cannot cure a prior error in adopting a substantive rule if the order depends on such a previously adopted rule.[24] Petitioner does not complain of the procedure in the license revocation proceeding.

Subsection (8) directs the parties and the court to distinguish between three kinds of claims. One is that a governing provision of law (not limited to statutes) requires the agency to take or to refrain from a particular action. The second is that the law assigns the

---

[24] We do not here refer to a petition for review of a rule as such, which ORS 183.400 somewhat cryptically directs to be determined "upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases." Nor do we refer to standards that may properly be adopted at the outset or in the course of a contested case under a statute that does not require prior rulemaking. *Cf. Marbet v. Portland Gen. Elect., supra.*

agency a range of discretion, but that the challenged order transgresses limits imposed on this discretion by the range of the authorizing law, by other statutory or constitutional provisions, or by the agency's own rules or established prior policies. [25] The third is that the order is not supported by substantial evidence in the record. If error is found, the statute provides for reversal, modification, or remand as appropriate to the

[25] This provision of ORS 183.482(8)(b)(B), *supra,* which is new to Oregon law, appears to contemplate that in the absence of rules agencies will articulate their position in making orders or at least in keeping records of their practices, so as to make review under this subsection possible. In a decision interpreting the predecessor of this provision in the Florida Administrative Procedure Act, F.S.A. § 120.68(12)(b), as well as other provisions not present in Oregon's APA, a Florida District Court of Appeal has stated:

"By requiring agency explanation of any deviation from 'an agency rule, an officially stated policy, or a prior agency practice,' Section 120.68(12)(b) recognizes there may be 'officially stated agency policy' otherwise than in 'an agency rule'; and, since all agency action tends under the APA to become either a rule or an order, such other 'officially stated agency policy' is necessarily recorded in agency orders. All such rules and orders, catalogued by a subject-matter index, must be made available for inspection and copying by the public in an ever-expanding library of precedents to which the agency must adhere or explain its deviation. Sections 120.53(2), 120.68(12)(b).

. . . .

"Section 120.57 proceedings, in which the agency's nonrule policy is fair game for a party's challenge both in the public and in his private interest, concludes by a final agency order which explicates 'policy within the agency's exercise of delegated discretion,' explains any deviation from 'an agency rule, an officially stated policy, or a prior agency practice,' and, in a 'licensing' proceeding such as this one, 'state[s] with particularity the grounds or basis for the issuance or denial' of the license. Sections 120.57(1)(b)9, 120.57(2)(a)1 and 2, 120.60(2), 120.68.

"Judicial review proceedings under Section 120.68 similarly press for crystalization of agency discretion. . . .

. . . .

"Failure by the agency to expose and elucidate its reasons for discretionary action will, on judicial review, result in the relief authorized by Section 120.68(13): an order requiring or setting aside agency action, remanding the case for further proceedings or deciding the case, otherwise redressing the effects of official action wrongfully taken or withheld, or providing interlocutory relief."

*McDonald v. Dept. of Banking and Finance,* 346 S2d 569, 582-584 (Fla App, 1977).

character of the error and the agency's further role in the matter; subsection (7) forbids the court to substitute its own judgment for that of the agency on issues of fact or agency discretion. The latter restraint on overenthusiastic judicial review is reinforced in a new section, ORS 183.486, enjoining the reviewing court to affirm the agency action unless one of the specified grounds of error can be identified. But the court is not confined within the formal limits of the petition. The court is to provide "whatever relief is appropriate irrespective of the original form of the petition"; it may "decide the rights, privileges, obligations, requirements or procedures at issue between the parties," and it may order ancillary relief when necessary.[26]

We conclude that petitioner is entitled to relief. His license has been revoked under a statutory standard of "unprofessional conduct," that was broadened beyond its original list of specifications, which the statute means the board to particularize by rules. Although his original attack was couched in constitutional terms, its target was the same lack of comprehensible and channeling criteria that the rules are meant to

---

[26] ORS 183.486:

"(1)   The reviewing court's decision under ORS 183.482 or 183.484 may be mandatory, prohibitory, or declaratory in form, and it shall provide whatever relief is appropriate irrespective of the original form of the petition. The court may:

"(a)   Order agency action required by law, order agency exercise of discretion when required by law, set aside agency action, remand the case for further agency proceedings or decide the rights, privileges, obligations, requirements or procedures at issue between the parties; and

"(b)   Order such ancillary relief as the court finds necessary to redress the effects of official action wrongfully taken or withheld.

"(2)   If the court sets aside agency action or remands the case to the agency for further proceedings, it may make such interlocutory order as the court finds necessary to preserve the interests of any party and the public pending further proceedings or agency action.

"(3)   Unless the court finds a ground for setting aside, modifying, remanding, or ordering agency action or ancillary relief under a specified provision of this section, it shall affirm the agency action."

provide. No such rule having been made to proscribe the kind of conduct charged against petitioner, there was no legal ground on which to revoke his license. The board "erroneously interpreted a provision of law," namely ORS 679.140(1)(c) and (2), in believing that the standard could be applied ad hoc to facts not covered by a specification in subsection (2) or a rule adopted pursuant to ORS 679.250(7). The error could not be cured on a remand. Thus ORS 183.482(8)(a)(A) requires that the board's order be reversed.

Reversed.

**DENECKE, C. J.,** specially concurring.

The majority opinion holds that ORS 679.140 requires the Oregon State Board of Dental Examiners to promulgate rules defining "unprofessional conduct" and, in the absence of such rules, the Board cannot revoke petitioner's license for "unprofessional misconduct."

I agree that the State Board is required to promulgate rules; however, I am of the opinion that it is a fiction to hold that the statutory scheme and legislative history lead to the conclusion that the legislative intent was to require the Board to make such standards. I am of the further opinion that it is more realistic to hold that the court, pursuant to its power to review the decisions of the Board, is empowered to require the promulgation of such standards.

There is an involved legislative history of ORS 679.140. The following is a summary: The State Board of Medical Examiners disciplined a Dr. Mintz for "unprofessional conduct." The circuit court held the Board could not do so without first promulgating rules defining such conduct. We decided to the contrary. *Board of Medical Examiners v. Mintz,* 233 Or 441, 378 P2d 945 (1963). During the time of the Mintz litigation, the

[321]

State Board of Dental Examiners had legislation introduced, which was passed some time after our *Mintz* decision which expanded the meaning of "unprofessional conduct" for dentists. Or Laws 1963, ch 284, § 8. The bill contained no requirement that the Board promulgate rules defining "unprofessional conduct." At the same time the Dental Board also had legislation introduced, which also was passed, concerning dental hygienists. Dental hygienists are also regulated by the Dental Board. This legislation was considered by the same committees at the same time as the legislation relating to dentists. The dental hygienist legislation expressly required the Dental Board to adopt rules defining "unprofessional conduct." Or Laws 1963, ch 266. With this history, I am of the opinion that it is more reasonable to conclude that the legislature did not address the issue of whether the Dental Board must promulgate rules defining "unprofessional conduct."

If the legislature did not intend that the Board of Dental Examiners be required to promulgate rules defining "unprofessional conduct" what is the basis for a court making such a requirement? There is a growing body of authority that courts do have this power. Davis states the basis as follows:

> "* * * A fourth method could be the best and most important—the simple creation of common law by a reviewing court. Federal law requiring findings and reasons was mostly common law before it was codified by the Administrative Procedure Act; courts should require not only findings and reasons but also *standards or rules to guide the exercise of administrative discretion.*" Davis, Administrative Law of the Seventies, § 6.13, p 225 (1976).

The Oregon Court of Appeals apparently followed this principle in *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973). In that case the agency denied the petitioner a liquor license. The statute provided that the agency may refuse to grant a license if it has reasonable grounds to believe there are "sufficient

licensed premises in the locality" and the granting of a license is "not demanded by public interest or convenience." ORS 471.295(1). The court vacated the order of denial and directed the agency not to act on the application until it had adopted rules governing the issuance of licenses.

I would adopt this common-law principle in deciding this case. Attempting to reach the same result by interpreting the statute in my opinion can result, as I think it has in this case, in a very strained interpretation of a statute.

It is not always necessary for an administrative agency to fill in the gaps of its authority by rule making. The gaps can be filled in by deciding individual contested cases; that is, by the adjudicative process. This kind of rule making was expressly approved in *Securities and Exchange Com. v. Chenery Corp.*, 332 US 194, 67 S Ct 1575, 91 L Ed 1995, 2001-003 (1946). Schwartz summarized the *Chenery* opinion:

> "* * * An agency is not barred from applying a new principle in an adjudicatory proceeding simply because it had the power to announce that principle in advance by using its power of rule-making. In *Chenery* the Court upheld the refusal of the Securities and Exchange Commission to approve a corporation's reorganization on terms which would allow a profit to its directors and officers who had bought its stock with inside knowledge. The SEC had power to approve schemes which were 'fair and equitable,' and previously it had made no objection to 'inside' dealings in such circumstances. Though pressed with the argument that the SEC should not be allowed to 'legislate retrospectively' in this way, the majority held that to tie the commission's hands would 'stultify the administrative process. * * *.'" Schwartz, Administrative Law, 186 (1976).

In my opinion, for three reasons this is not a proper case for making a rule in the process of deciding a contested case. First, the potential sanction for a violation of the rule is severe,—a loss of license to practice a

profession. Second, the legislative standard, "unprofessional conduct," is particularly vague. Third, while the conduct on which the charge is based could, as the majority holds, properly be classified as "unprofessional conduct," it does not necessarily fall within a well understood meaning of "unprofessional conduct."

Tongue and Peterson, JJ., join in this specially concurring opinion.