Argued and submitted May 4, 1984, affirmed February 6, reconsideration denied May 10, petition for review denied July 9, 1985 (299 Or 443)

KORGAN et al,
*Petitioners,*

*v.*

# OREGON LIQUOR CONTROL COMMISSION,
*Respondent.*

(CA A28824)

695 P2d 81

Magar E. Magar, Portland, argued the cause and filed the briefs for petitioners.

Linda DeVries, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave

Frohnmayer, Attorney General, and James E. Mountain, Jr., Salem.

Before Buttler, Presiding Judge, and Warren and Van Hoomissen, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

Petitioners appeal from an order of the Oregon Liquor Control Commission (OLCC) suspending the Dispenser Class A license of The Chase Restaurant and Lounge or, alternatively, imposing a fine of $1,755 in lieu of suspension. We affirm.

In its final order, the commission concluded that petitioners had violated OAR 845-06-035(2) in permitting minors to consume alcoholic beverages and OAR 845-06-035(2)(b) in permitting minors to enter and remain on the licensed premises. It also determined that petitioners had "maintained a lewd establishment" in violation of ORS 472.180(5), which, in relevant part, provides:

> "The commission may cancel or suspend any license granted, or impose a monetary penalty in lieu of or in addition to suspension as provided by ORS 472.187, if it finds:
>
> "* * * * *
>
> "(5) That the licensee maintains a noisy, lewd, disorderly or insanitary establishment or has been supplying impure or otherwise deleterious beverages or food."[1]

In relation to the latter determination, the commission made the following relevant findings of fact:

> "3.   On December 23, 1981, male dancers were performing in the main portion of the lounge of The Chase. During their performance, the dancers mingled with the female patrons. The patrons on several occasions touched or caressed the buttocks or genital area of the dancers, who were wearing a brief g-string outfit. The dancers rubbed their pelvic area against the backs of female patrons. Patrons placed tips into the front of the g-string of the dancers. Dancers on occasion picked up female patrons and with the pelvic areas of both touching engaged in undulating motions simulating sexual intercourse. During this performance, many of the female patrons were sexually aroused.
>
> "4.   Licensee Milton Korgan was present during this performance.

---

[1] The only rule promulgated by the commission to implement ORS 472.180(5) that pertains to petitioners' case is OAR 845-06-045(2), which provides:

"No licensee shall permit, tolerate, participate in or encourage * * * any lewd conduct * * * in or upon licensed premises * * *."

"5.    On January 7, 1982, male dancers again performed at The Chase for approximately 55 female patrons. On many occasions, patrons stroked or fondled the buttocks or genital area of the dancers and placed tips inside the front of the g-string which the dancers were wearing. The dancers rubbed their pubic area on the leg and body of some of the patrons. Dancers and patrons engaged in acts of simulated sexual intercourse. Dancers on occasion pulled their g-string out revealing their genitals to patrons.[2]

"6.    Licensee Milton Korgan was present during the performance, acting as a master of ceremonies. He made many comments of a sexual nature to patrons, calling attention to the sexual organs of the dancers.[3]

"7.    Many of the patrons were sexually aroused during the performance.

"8.    On January 12, 1982, another performance of male dancers occurred at The Chase. Dancers rubbed their buttocks and pelvic area against the body of female patrons. Patrons touched the buttocks and genital area of the dancers, and again inserted tips into the g-string. Dancers and patrons engaged in simulated sexual intercourse. Dancers kissed patrons. One dancer appeared to the patrons to have an erection.

"9.    During this performance, Licensee Milton Korgan again performed the role of a master of ceremonies. He made many remarks of a sexual nature, such as guaranteeing the audience a 'double orgasm.' He also read verse of a sexual nature written by members of the audience.

"10.    On January 14, 1982, male dancers again performed at The Chase for an audience of approximately 75 to 80 women. The dancers again mingled with the audience. They danced on tables and among the patrons. Witnesses observed one instance of a patron touching the buttocks and genital area of the dancer. On other occasions, dancers rubbed their genitals on the body of a female patron and dancers and

---

[2]The activity involved on January 7, 1982, gave rise to the criminal prosecution of one of the male dancers, who was charged with violation of ORS 167.062, which makes it unlawful for any person to engage in sexual conduct in a live public show. *State v. House*, 66 Or App 953, 676 P2d 892, *mod* 68 Or App 360, 681 P2d 173, *rev allowed* 297 Or 546 (1984). We held that that statute as interpreted was not vague, but that it was constitutionally overbroad.

[3]Petitioners moved to strike the testimony relating to Milton Korgan's comments to the audience on First Amendment grounds. Because petitioners have not assigned as error the denial of that motion, we do not consider it.

patrons performed simulated acts of sexual intercourse. Patrons were very excited and pawed the dancers.

"11. Licensee Milton Korgan was present on this evening and made many comments of a sexual nature to the audience."

In their first assignment, petitioners contend that the word "lewd" in ORS 472.180(5) is unconstitutionally vague[4] and that the commission erred in not so declaring. In *Palm Gardens, Inc. v. OLCC,* 15 Or App 20, 28-31, 514 P2d 888 (1973), *rev den* (1974), we rejected an identical challenge to that statute, stating:

"We are aware that there are some cases which find that 'lewd' is unconstitutionally vague. However, our review of the law in this area convinces us that, through its long use in the criminal law, the term indicates with sufficient specificity the proscribed conduct so that men of ordinary understanding can govern their activities, and, consequently it is not unconstitutionally vague." 15 Or App at 31. (Citations omitted.)

We are asked to reexamine that holding in the light of more recent developments in the law.

In *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980), the Supreme Court reiterated two concerns about vague penal laws: (1) they allow a court or jury to define a crime after the fact, contrary to Article I, section 21, of the Oregon Constitution, and (2) they do not provide fair notice of the conduct proscribed, so that the imposition of punishment is a deprivation of liberty or property without due process of law, in violation of the Fourteenth Amendment. Because the object of a law permitting the Board to revoke a dentist's license for "unprofessional conduct" was not to punish misconduct as such, but to confine the practice of dentistry to those who maintain professional standards of conduct, the court concluded that it did not offend the state

---

[4] Petitioners' void-for-vagueness challenge is based on Article I, section 21, of the Oregon Constitution and the Fourteenth Amendment to the United States Constitution. They do not raise an overbreadth challenge (*see State v. House, supra,* n 2) in their opening brief, but attempt to remedy that defect by contending in their reply brief that "implicit in any challenge for vagueness is one for overbreadth." Because vagueness and overbreadth are separate doctrines, *see State v. Robertson,* 293 Or 402, 407, 649 P2d 569 (1982), petitioners' failure to raise an overbreadth challenge in their opening brief precludes their relying on it. ORCP 7.36(1).

constitutional prohibition against *ex post facto* laws. More-over, the court said that reliance on federal decisions constru-ing penal laws under the Fourteenth Amendment was also misplaced, because the state of the law was inconclusive as to whether standards for occupational licensing must meet those for penal sanctions.[5] The court went on to hold, however:

> "* * * [W]hen a licensing statute contains both a broad standard of 'unprofessional conduct' that is not fully defined in the statute itself and also authority to make rules for the conduct of the regulated occupation, the legislative purpose is to provide for the further specification of the standard by rules, unless a different understanding is shown. * * *" 288 Or at 313.

*Megdal* thus establishes that, although standards for review of vague penal laws are inapplicable to administrative law, legislative intent to vest rulemaking authority in an appropriate agency may require further definition of general terms. Because in *Palm Gardens, Inc. v. OLCC, supra,* we upheld the statute under standards governing review of penal laws challenged for vagueness, which was a more stringent test than *Megdal* requires, there is no occasion to overrule that case, unless OLCC's failure to define the word "lewd" with more specificity by rule is fatal under *Megdal.* That is peti-tioner's second assignment.

Shortly after *Megdal* was decided, the court decided *Springfield Education Assn. v. School Dist.,* 290 Or 217, 621 P2d 547 (1980), which described three classes of statutory terms, each of which conveys a different responsibility for an agency in its initial application of a statute: (1) terms of pre-cise meaning, which require only application to facts by the

---

[5] More recently, in *Hoffman Estates v. Flipside, Hoffman Estates,* 455 US 489, 498, 102 S Ct 1186, 71 L Ed 2d 362 (1982), the Supreme Court stated:

> "* * * The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depend in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. * * *" (Footnotes omitted.)

agency; (2) inexact terms, which embody complete expressions of legislative meaning, but require agency interpretation either by rule or by order in a contested case; and (3) terms of delegation, which require further legislative policy determination by the agency through rulemaking. 290 Or at 223-28. In *Ross v. Springfield School Dist. No. 19,* 294 Or 357, 657 P2d 188 (1982), the court applied that system of classification to a statute that authorized the dismissal of a permanent teacher for "immorality" and concluded that that term was one of "complete legislative expression," which the Fair Dismissal Appeals Board could have appropriately interpreted by order in a contested case. Because the order failed to define the term "immorality" as it was applied to the petitioner's case, however, the court reversed and remanded the case to FDAB for a determination of whether the facts were adequate to justify the statutory conclusion. 294 Or at 368-70.

Although we have previously expressed doubt as to the utility of the *Springfield* classification system, *see Trebesch v. Employment Division,* 68 Or App 464, 683 P2d 1018, *rev allowed* 297 Or 824 (1984), we conclude that the term "lewd" falls within the second category specified in *Springfield,* as "immorality" did in *Ross,* and that OLCC was authorized to interpret it either through rulemaking, or through an order in a contested case, as it did here. The only question remaining is whether the commission's interpretation of "lewd" is consistent with the legislative policy. *Springfield Education Assn. v. School Dist., supra,* 290 Or at 223.

In its "Ultimate Findings of Fact and Conclusions of Law," the commission concluded, in pertinent part:

> "The Evidence establishes that the actions of the dancers and patrons and the behavior of Licensee were lewd, that is, lustful, indecent, lascivious, or lecherous, on December 23, 1981, January 7, 1982, January 12, 1982, and January 14, 1982. The occurrence of this pattern of incidents establishes that Licensees 'maintained,' a lewd establishment."

Although the commission did not mince words in articulating its reasoning that the conduct in question was "lewd," its interpretation of that term as "lustful, indecent, lascivious, or lecherous" is consistent with our interpretation of the term in *Palm Gardens, Inc. v. OLCC, supra,* 15 Or App at 28-30, and with the generally expressed legislative policy. Therefore, it

must be upheld. *Megdal* does not require that *Palm Gardens* be overruled.

■ Petitioners' third contention is that the OLCC erred in failing to consider adequately their defenses to the charges of allowing minors to enter and consume alcoholic beverages. The gist of their argument is that the doorchecker employed by the Chase Lounge was acting as a police informant and that his actions either constituted entrapment or were so outside the scope of his employment that petitioners should not be held vicariously liable for them. In its final order, the commission stated, in pertinent part:

> "With respect to the charges relating to minors, Licensees attempted to show that the doorchecker involved had been attempting to impress local law enforcement personnel and that he therefore had intentionally permitted the minors to enter the premises so that he could inform on Licensees. The doorchecker was not at the hearing. This allegation was not supported by persuasive evidence."

The commission considered the evidence and found it unpersuasive. It is not our role to reassess or reweigh facts about which there is an evidentiary dispute. *Brady v. Bureau of Labor,* 55 Or App 619, 625, 639 P2d 673 (1982).

We have considered petitioners' other assignments of error and hold them to be without merit.

Affirmed.