Argued and submitted April 30, affirmed September 29, 1982

# GROENER,
*Petitioner,*

*v.*

# OREGON GOVERNMENT ETHICS COMMISSION,
*Respondent.*

## (CA A22213)

651 P2d 736

J. Gary McClain, Milwaukie, and Harl H. Haas, Portland, argued the cause and filed the briefs for petitioner.

David W. Hittle, Salem, argued the cause and filed brief for respondent.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Petitioner seeks judicial review of the respondent Commission's order determining that petitioner violated ORS 244.040(1) of the Oregon Ethics Law and imposing a $1,000 fine for that violation. He assigns two errors: (1) that the Commission's "Conclusions of Law *[sic]* * * * are not supported by substantial evidence in the record," and (2) that ORS 244.040(1) is unconstitutionally vague, thereby depriving petitioner of federal due process rights. We affirm.

Because we conclude, *infra,* that respondent's findings and conclusions are supported by substantial evidence, we adopt pertinent parts of the Commission's order as the statement of facts.

### "FINDINGS OF FACT

"1) [Petitioner], between 1975 and 1981, was a State Senator. During that period, he also was Chairman of the Senate Labor Committee, until his removal in the 1981 legislative session. During that period, the Senate Labor Committee considered virtually all bills affecting Workers' Compensation.

"2) From 1976 to 1981, [petitioner] received payments for 'consulting' services from three business firms owned by C. Dennis Williams. In 1976, [petitioner] received $2,500 from Williams' School of Selling. In 1977, he received $2,500 from Williams' Institute of Marketing and Management. In 1978 and 1979, he received $3,000 and $500 respectively, from that firm. In 1979, he also received $3,500 from the Williams' Job Search. In 1980, he received approximately $4,500 from Williams' Job Search. Detailed records of work performed by [petitioner], specifically, the accounting detail for the above payments, were kept by Mr. Williams. These records no longer exist.

"3) Before creation of the Field Services Division (FSD) of the Workers' (then Workmen's) Compensation Department, the Board regularly would assign injured workers to the Vocational Rehabilitation Division (VRD) of the Human Resources Department for retraining and job placement. When considered appropriate, a VRD counselor would refer the injured worker to a 'private vendor' for more intense or specialized retraining services. The Workmen's Compensation Board would pay for the services.

"4)  FSD was created by statute on September 1, 1977, and grew rapidly. By 1978, it was divided into regions. Injured workers first would be referred to an FSD service coordinator, who would provide direct service. Assignments of injured workers to private vendors of VRD would be made by a vocational coordinator, and, at times, after a recommendation by the service coordinator. The vocational coordinator had wide discretion in referring injured workers to private vendors.

"5)  Before October 1, 1979, FSD would refer workers to private vendors without a contract. FSD awarded a contract effective October 1, 1979 to September 30, 1980 to virtually any private vendor requesting one. FSD established criteria which prevented 'unqualified' private vendors from being awarded contracts effective beginning October 1, 1980.

"6)  Between 1975 and 1981, Mr. Williams' businesses were 'private vendors'. The sole source of income of Williams' Job Search was referrals by FSD. From December 4, 1978 to February 28, 1981, Williams' Job search received approximately $418,800.00 for referrals for FSD.

"7)  In 1974, [petitioner] accompanied Mr. Williams to the office of Louis McCanna, senior counselor for VRD. Mr. Williams discussed his private vendor services. [Petitioner] told Mr. McCanna 'I'm very interested in this program,' a reference to either Mr. Williams' business or VRD. Mr. McCanna knew that [petitioner] was a State Senator.

"8)  From late 1977 to late 1980, [petitioner] arranged and attended three or four luncheon or dinner meetings with Roy Green, Director of the Workers' Compensation Department, Mr. Williams, and Maureen Mengis, an associate of Mr. Williams. At the first meeting, [petitioner] mentioned that Mr. Williams had an excellent performance record, and discussed the good points of Mr. Williams' business. At each meeting, Mr. Williams expressed his desire for more business from FSD. Although Mr. Green occasionally met with other private vendors, none of those meetings were arranged or attended by legislators nor did [petitioner] arrange or attend meetings for other private vendors.

"9)  Roy Green was confirmed as Director of the Workers' Compensation Department in late 1977 with the support of [petitioner]. He believed that 'without Senator

Groener's assistance, probably much of the legislation to improve the system possibly could not have been passed.'

"10) In 1978, [petitioner], at the request of Mr. Williams, called John Sollman, administrator of the FSD Callahan Center. He asked why Mr. Sollman was allowing a particular vendor to have access to the Center. Mr. Sollman indicated that the vendor had been ejected. [Petitioner] stated that that was not his understanding, and Mr. Sollman should use vendors from a list on which Mr. Williams ranked high. [Petitioner] mentioned only Mr. Williams by name. Mr. Sollman knew 'Dick Groener' was a State Senator, and felt the contact was inappropriate. [Petitioner] admitted he was paid as a consultant by Mr. Williams to make the call.

"11) In March 1978, Bob Medak, student at Williams' Institute of Marketing and Management, was in Mr. Williams' office when the latter called [petitioner] to complain about falling enrollments at the school. Mr. Medak heard Mr. Williams say 'What the devil's going on here, you know we're kind of hurtin' over here. We need more business.' When Mr. Williams hung up, he said that [petitioner] was 'going to look into it.'

"12) During Labor Day weekend, September, 1979, a Las Vegas hotel/casino invited [petitioner] and guests to a weekend of gambling. [Petitioner] invited Mr. Green and Mr. Williams. [Petitioner] also called Mr. Green on Mr. Williams' behalf to ask if Russ Carter properly could attend the trip. At that time, Mr. Carter was Field Service Division Regional Manager in the Portland area. Mr. Williams and Mr. Carter, until then, had never socialized. Mr. Carter, before the trip, had been 'cool' toward Mr. Williams' services. Immediately after the trip, Mr. Carter ordered that referrals be made to Williams' Job Search. As a result, there was a dramatic increase in Portland FSD referrals in October not justified by Williams' Job Search classes.

"13) In September 1979, at a Coos Bay labor convention, [petitioner] had lunch with FSD Administrator Norman Alverson. During lunch, [petitioner] stated that he knew the Governor, and if referrals continued to Mr. Williams, Mr. Alverson could receive the position of Director of the department.

"14) On September 15, 1979, [petitioner] asked Harold Morton, Service Coordinator with Field Services Division and friend, to visit his home. Shortly after Mr.

Morton arrived, Mr. Williams and Ms. Mengis appeared. Mr. Morton was not well acquainted with Mr. Williams. [Petitioner] suggested they go out for drinks. Mr. Williams used the opportunity to sell his services.

"15) In late 1979, probably September, Mr. Williams complained to Weldon Moore, Regional Manager, Portland FSD, that he was not getting enough referrals from the Portland office. Mr. Moore stated that Mr. Williams would be referred only those persons who could benefit. Mr. Williams' parting remark was, 'Well, I'll have to talk to my friends in Salem.' Shortly thereafter, Senator Groener visited the office.

"16) In approximately April 1980, proposals by private vendors for contracts with FSD effective October 1, 1980 were evaluated by the Workers' Compensation Department. When Williams' Job Search was rejected, Mr. Williams complained to Jean Immel Thorne, administrative division employe coordinating the evaluation process. After denying Mr. Williams' request for re-evaluation of an amended proposal, Ms. Thorne received a call from Lloyd Gardner, Assistant Director of the Workers' Compensation Department. Mr. Gardner stated that Director Green had been called by [petitioner], who was concerned that Mr. Williams had been fairly treated. Mr. Gardner told her [petitioner] was a good friend of the department, and he wanted to make sure [petitioner] understood Mr. Williams was treated fairly. He then asked her to re-evaluate the amended proposal, despite the deadline having passed. The amended proposal still failed to meet minimum requirements. No other legislator had called for any private vendor, nor did [petitioner] call for any other private vendor.

"CONCLUSIONS OF LAW

"Count 5 charges a violation of ORS 244.040(1). That statute provides in part:

'No public official shall use his official position or office to obtain financial gain for himself, other than official salary, honoraria or reimbursement of expenses . . .'

"1) During the time relevant to the charge, [petitioner] was a public official.

"2) [Petitioner] was being paid by associate and friend, C. Dennis Williams to use the influence or power of his office to obtain business for Mr. Williams. [Petitioner]

used his office for personal financial gain by not making a clear and unequivocal distinction between his office and his private consulting service, and by using his official position to advance his consulting business.

"3) [Petitioner] used his office for personal financial gain directly by requesting business for Mr. Williams (Roy Green luncheon, John Sollman telephone call, and Norman Alverson luncheon).

"4) [Petitioner] used his office indirectly for personal financial gain by:

"a) Setting up meetings permitting Mr. Williams to sell his services (Roy Green luncheons, Las Vegas trip, and Harold Morton incident).

"b) Interceding on Mr. Williams' behalf (John Sollman call, Las Vegas trip, Weldon Moore incident, and Jean Immel Thorne incident).

"c) Letting it be known he was a supporter and friend of Mr. Williams (Roy Green luncheons, Las Vegas trip, Harold Morton incident, and Jean Immel Thorne incident).

"5) Documents and testimony in the record do indicate a financial benefit to [petitioner] from Mr. Williams, but do not indicate the precise amount of financial benefit to [petitioner] in violation of ORS chapter 244 because the detailed accounting records kept by Mr. Williams of compensation paid for work performed by [petitioner] no longer exist. The forfeiture required under ORS 244.360, therefore, cannot be assessed."

■ Petitioner argues that the Commission's "conclusions" and order are not supported by substantial evidence. *See* ORS 183.482(8)(c). That assignment of error encompasses the contention that contested findings of fact are not supported by substantial evidence in the record, as well as the contention that the findings do not support the conclusions of law that petitioner violated the Act.

■ Petitioner complains that testimony of various witnesses presents too little, conflicting or not credible evidence. Inconsistency and conflicts in testimony raise questions of credibility and are for the trier of fact, here the Commission. In adopting its findings, some of which turn on whose testimony is believed, the Commission necessarily resolved credibility questions against petitioner.

We may not substitute our judgment on those questions. Although there are conflicts in testimony and inconsistencies, the evidence would allow reasonable persons to differ as to whether the facts were established. *See Dietz v. Smith,* 28 Or App 871, 561 P2d 1032 (1977). Whether there is too little evidence to support the findings relates to the question of substantiality, which the court may assess on judicial review. Here, once the credibility issue was resolved by the Commission, there is substantial evidence to support the findings, and we are bound by them under ORS 183.482(7).

Whether those findings support the conclusions involves a determination of whether the Commission properly applied the statute to the facts; that issue may involve the question whether the Commission carried out the legislative policy embodied in the statutory scheme. The essence of petitioner's second assignment of error is that ORS 244.040(1) is so vague that no one can know what the legislature intended and, therefore, the Commission could not have applied the statute properly here. We turn to that assignment before addressing the question whether the findings support the conclusions.

Petitioner contends that (1) ORS 244.040(1) is unconstitutionally vague, because it is a penal statute that does not adequately define the proscribed conduct[1]; and (2) because respondent may issue on its own motion advisory opinions on the requirements of ORS chapter 244, *see* ORS 244.280, the Commission could have cured the statutory vagueness, but did not do so.

---

[1] Petitioner offers several examples of conduct that might be contended to fall within the statutory proscription but were not intended to be proscribed: a legislator, who is a homeowner, voting for legislation to increase property tax relief; a legislator, who has a state employe as a member of his household, voting to increase state employes' salaries; and a legislator voting to increase legislators' pension benefits. Those examples would be instances where the legislator would be performing the duties for which he is elected. *See* ORS 244.020(4)(b) ("potential conflict of interest" does not include official actions that affect to the same degree certain classes of which official is a member). Furthermore, "[a] legislature can make a law as 'broad' and inclusive as it chooses unless it reaches into constitutionally protected ground." *State v. Blocker,* 291 Or 255, 261, 630 P2d 824 (1981); *see State v. Robertson,* 293 Or 402, 649 P2d 569 (1982). The examples might well involve questions of interpretation or legislative intent, but not vagueness. Petitioner has not assigned as error that the statute is unconstitutionally overbroad.

■  We first note that ORS chapter 244 does not delegate general rulemaking power to the Commission. Rather, the general legislative grant is of investigative, adjudicative, enforcement and advisory powers, with limited rulemaking power under specific sections, *i.e.,* ORS 244.060; 244.080(3); 244.100(1) and (2); 244.130(1); 244.290; *see* former ORS 244.350 (amended by Or Laws 1977, ch 588, § 10), requiring respondent to adopt a schedule for civil penalties or to prescribe forms under ORS 244.020(4) and (5)(c). The legislature did not grant substantive rulemaking authority under ORS 244.040, the statute at issue here.

■  It seems apparent that the reason the legislature did not grant the Commission authority to adopt regulations under ORS 244.040 is that the legislature did not simply proscribe "unethical conduct" and leave it to the Commission to prescribe standards which public officials must meet. The statute, by its own terms, defines the conduct that violates what the legislature characterized as the "Code of Ethic" for public officials. At the same time, the legislature established the Commission to enforce that code. Although ORS 244.280(1) allows the Commission to issue on its own motion advisory opinions on the requirements of Chapter 244, there is no requirement that it do so. ORS 244.280(1) provides:

> "(1) Upon the written request of any public official, candidate for public office or any person, or upon its own motion, the commission may issue and publish opinions on the requirements of this chapter, based on actual or hypothetical circumstances."

It is equally apparent that in enforcing the Code of Ethics, the Commission is expressly authorized to interpret the statutory language, either in advance by advisory opinion, or after the fact in the adjudicatory process, as here.

Although this case is different from *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980), where the agency had an express grant to make substantive rules to prescribe standards under the undefined statutory term "unprofessional conduct," petitioner's attack on the statute is similar to that made by Megdal. As in *Megdal,* an initial distinction must be made whether the statutory

proscription is attacked as inadequate to inform the regulated persons of the conduct proscribed or whether it is inadequate to guide the enforcing agency. Petitioner attacks ORS 244.040(1) specifically on the first ground, but he also argues that that alleged defect fosters arbitrary application, *i.e.,* that the statute is inadequate to guide the agency. *Megdal* is instructive on both points.

> "Often very broad terms, even broader than 'unprofessional conduct,' are employed in laws that assign an agency responsibility for managing a program or pursuing a policy whose goals the law indicates only in the most general sense. As recently stated in *Anderson v. Peden,* 284 Or 313, 587 P2d 59 (1978), the constitutional issue in such broad delegations of authority is only whether it remains possible for the agency and for reviewing courts to determine when subsequent agency rules or actions have honored and when they have departed from the general policy indicated by the politically accountable lawmaker. * * * But almost always scrutiny of the grant of authority will turn this necessary determination into a question of interpreting the agency's assignment rather than of invalidating the delegation for vagueness. Beyond doubt 'unprofessional conduct' is constitutionally adequate as a directive giving the board authority to prescribe standards under which its licensees will be subject to professional discipline.

> "It is another question whether 'unprofessional conduct' is adequate by itself as a standard for deciding individual cases. It involves additional considerations which are reflected in different constitutional premises. In criminal cases, one concern about overly general or vague penal laws is that they not only allow a court or a jury to define a crime but to do so after the fact, contrary to article I, section 21 of the constitution. *See State v. Blair,* 287 Or 519, 601 P2d 766 (1979), quoting from *State v. Hodges,* 254 Or 21, 457 P2d 491 (1969). The second concern is that such laws do not give fair notice of what they proscribe in time to let a person conform to the law, so that the imposition of punishment deprives him of liberty or property without due process of law under the fourteenth amendment. *See State v. Hodges, supra; Lanzetta v. New Jersey,* 306 US 451, 59 S Ct 618, 83 L Ed 888 (1939). As a premise for a requirement of due process, the right to notice of the law has its own problems. But in any event this principle, like that against *ex post facto* laws, is generally confined to

penal sanctions. No one familiar with the common law expects due process to preserve one either from indefinite standards or from their delegation to juries or judges in civil cases, though one may stand to lose far more than under many criminal laws. *See Anderson v. Peden, supra,* 284 Or at 324.

"We may assume that petitioner could not be prosecuted for a statutory crime described only as 'unprofessional conduct.' But the same premises do not obviously apply to a revocation of his professional license under that standard. If loss of the right to practice one's profession were employed as a form of punishment for delinquencies apart from safeguarding proper performance in the professional role, the implications would go beyond the adequacy of the standard to issues of criminal procedure generally, *see Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 100, 105, 570 P2d 52 (1977) and *cf. Dickinson v. Davis,* 277 Or 665, 670-671, 561 P2d 1019 (1977) * * *. No doubt the disqualified person's loss is equally grave whether it is inflicted as punishment for wrongdoing or as enforcement of professional discipline. But we have no reason to attribute the former rather than the latter objective to laws that allow disqualification for unprofessional conduct. Petitioner cannot rest a constitutional attack on ORS 679.140 on the decisions that hold penal laws unenforceable for vagueness." 288 Or at 297-300. (Footnotes omitted.)

Although ORS 244.350 provides for "civil penalties," and ORS 244.360 provides for forfeiture of twice the financial benefit the public official received in violation of the Act, neither provision is penal in the sense of a criminal sanction; each is a civil sanction designed to deter violation of the legislative policy of safeguarding the public trust inherent in holding a public office. ORS 244.010. It is questionable whether the "fair warning" requirement of the Due Process Clause applies to such civil liability, but, even if it does, the plain meaning of the words in ORS 244.040(1), as defined generally in dictionaries and otherwise defined specifically by ORS chapter 244, does not require "men of common intelligence [to] guess at [the] meaning." *Connally v. General Constr. Co.,* 269 US 385, 391, 46 S Ct 126, 70 L Ed 322 (1926).

Further, ORS 244.280 expressly provides a procedure by which a public official in doubt about the

propriety of proposed conduct may petition for and obtain the Commission's opinion, which is binding on the Commission as to that petitioner. The United States Supreme Court found a similar procedure of significance in defeating a vagueness challenge to the Hatch Act, which proscribes certain political activities by federal employes:

> "It is also important * * * that the [Civil Service] Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law, at least insofar as the Commission itself is concerned. [Footnote omitted.]" *CSC v. Letter Carriers,* 413 US 548, 580, 93 S Ct 2880, 37 L Ed 2d 796 (1973).

Petitioner did not avail himself of that procedure. Respondent was under no obligation to issue an advisory opinion absent petitioner's request. *Cf. Fadeley v. Ethics Comm.,* 30 Or App 795, 568 P2d 687 (1977) (Ethics Commission is required to issue advisory opinion on request of public official only when requested opinion involves official's own affairs).[2] We conclude that the law is not unconstitutionally vague.

It remains to decide what the statute means. We have already said that the legislature delegated to the Commission authority to interpret the law in

---

[2] However, as the court in *Megdal* noted

"There is no lack of suggestion that a prior specification of grounds should be a prerequisite of due process in administrative as well as penal deprivations * * *

"* * * * *

"Perhaps federal 'due process' law will move toward [that] step * * *. But, * * * there has been no clear signal from the United States Supreme Court * * *. Again, the factors from which *Mathews v. Eldridge,* 424 US 319, 96 S Ct 893, 47 L Ed 2d 18 (1976), directs us to derive the requirements of due process — the private interest affected, the chances of error and of its reduction by better procedures, and the countervailing governmental interests — clearly affirm a licensee's right to the kind of adjudicatory procedures of notice, hearing, and findings based on evidence that, in this state, are provided him under the administrative procedure act; but nothing indicates whether this due process calculus extends also to restricting adverse action to the enforcement of previously specified norms. * * *." 288 Or at 300-03. (Footnotes omitted.)

contested cases and by advisory opinions. *See* ORS 244.260; 244.280; 183.310-.550. Although

> "* * * its contours might have to be derived from the context and legislative history, its meaning * * * [is] a question of statutory interpretation * * *. [A]n agency interpretation of a broadly stated standard entrusted to it is often entitled to judicial respect * * *. But it remains an interpretation rather than an execution of a legislative assignment to make new rules." *Megdal v. Board of Dental Examiners, supra*, 288 Or at 304-05. (Citation omitted.)

■ Judicial review of administrative application of that interpretation in the order is limited to review for errors of law under ORS 244.260, which subjects this case to contested case procedures under the Administrative Procedures Act (ORS 183.310.550), including ORS 183.482(8)(a):

> "(a) The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:
>
> "(A) Set aside or modify the order; or
>
> "(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

Thus, interpretation is initially for the agency; the issue of law on review is whether the agency interpretation coincides with legislative policy.[3]

There is little in the Commission's order that involves interpretation of the statutory language, as opposed to a simple application of that language to the facts as found in this case. Arguably, because the findings include both direct and indirect use by petitioner of his official position for his financial gain, the Commission interpreted "use" as including both direct and indirect. That interpretation of "use" is within the plain, dictionary meanings of the term and is compatible with the legislative policy to safeguard the public trust. *See* ORS 244.010(1). It is implicit in the order that it is not necessary for a public

---

[3] *See Springfield Education Assn. v. School Dist.*, 290 Or 217, 224-28, 621 P2d 547 (1980); *Donnell v. Eastern Oregon State College*, 59 Or App 246, 650 P2d 1012 (1982).

official to identify expressly the public office he holds when attempting to influence someone, so long as that someone knows it. The evidence here supports the findings that those persons knew who petitioner was without being told by him that he was a state senator.

We conclude that the Commission's interpretation of the statute was within its authority to enforce the code and that its application here was within the terms of ORS 244.040(1) and the legislative policy behind it.

Affirmed.