Argued and submitted December 14, 1984, resubmitted In Banc April 4, affirmed June 26, reconsideration denied August 16, petition for review allowed September 17, 1985
(300 Or 64)
See 300 Or 415 (1985)

In the Matter of the Alleged
Violation of ORS 244.040(1)
by David A. Davidson, Petitioner.

DAVIDSON,
*Petitioner,*

*v.*

OREGON GOVERNMENT ETHICS
COMMISSION,
*Respondent.*

(CA A31304)

702 P2d 417

Ridgway K. Foley, Jr., P.C., Portland, argued the cause for petitioner. With him on the briefs were William H. Replogle,

and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

ROSSMAN, J.

Buttler, J., dissenting.

Warren, J., dissenting.

## ROSSMAN, J.

Petitioner seeks review of an order by the Oregon Government Ethics Commission (OGEC) in a contested case under ORS 244.260(3), which determined that he had violated ORS 244.040(1) and ordered him to pay a forfeiture of $2,575. Among other contentions, petitioner asserts that the order is based on an incorrect interpretation of the statute. We disagree and affirm.

ORS 244.040(1) states:

"No public official shall use his official position or office to obtain financial gain for himself, other than official salary, honoraria or reimbursement of expenses, or for any member of his household, or for any business with which he or a member of his household is associated."

The issue in this case is whether petitioner "use[d] his official position * * * to obtain financial gain."

Petitioner was vice-president and actuary of the State Accident Insurance Fund (SAIF) at the time of the conduct with which he is charged. In 1982, the management of SAIF decided to buy a fleet of cars. Petitioner was a member of the senior management group which gave its blessing to the plan before it was approved by SAIF's Board of Directors. However, he was not directly involved in choosing the dealers from whom the purchases were to be made. After bids for the cars were received, another vice-president informed petitioner during a casual conversation that the quoted prices were "extraordinarily good" and that the purchase of a fleet provided any interested individual with a good opportunity to purchase a car for his personal use as an "add-on" to the fleet purchase. Although it is not altogether clear, it appears that only a handful of employes were notified of the opportunity.

Following that conversation, petitioner asked a SAIF staff lawyer for his informal legal opinion as to whether his purchase of a car as an "add-on" would violate the Code of Ethics, ORS 244.040. Petitioner was told that it would not and thereafter ordered a vehicle from SAIF's director of administrative services, who then relayed the order to the dealer. To take advantage of the price break, it was necessary that the car be ordered in SAIF's name. On delivery, SAIF paid for the car and was reimbursed by petitioner. The title to the car was

originally issued to SAIF and was later transfered to petitioner. Petitioner saved almost $1,300 in comparison to the price that was available to an ordinary consumer. Add-ons were not the general rule. In fact, another vice president testified that, since he had joined SAIF in 1980, petitioner's add-on was the only one he had ever known of.

■       OGEC found that petitioner's conduct was a use of "his official position or office to obtain financial gain for himself" proscribed by ORS 244.040(1). It argues that we should interpret broadly the term "use" to cover the situation in which a public official avails himself of an opportunity to save money presented by the fact of his employment. Petitioner contends that the statute is intended to apply to a more narrow class of situations in which a public official uses, or attempts to use, the power and influence of his office to obtain a financial gain for himself or a member of his household. We must set aside the order if we find that OGEC erroneously interpreted the law. ORS 183.482(8)(a)(A).

Petitioner and the dissent rely on *Groener v. Oregon Gov't Ethics Comm.,* 59 Or App 459, 651 P2d 736 (1982), to contend that the term "use," as employed in ORS 244.040(1), means only influence peddling. In *Groener,* we affirmed OGEC's order which found a violation of ORS 244.040(1). A state senator, who had received payments for consulting services from Williams, used the influence of his office to obtain business for Williams. On one occasion, the Senator stated that he knew the Governor and could use his influence to obtain a promotion for someone if that person continued to refer business to Williams. On other occasions he used the influence of his position to obtain a directorship for someone and to push through legislation in exchange for the referral of business to Williams. This court held that the evidence supported a conclusion that the Senator had used his position for financial gain. We said:

> "[I]t is not necessary for a public official to identify expressly the public office he holds *when attempting to influence someone,* so long as that someone knows it." 59 Or App at 471-72. (Emphasis supplied.)

Although the financial gain to the Senator was received indirectly from Williams, it was the *quid pro quo* for his exercise of the power and influence of his official position.

Petitioner's reliance on *Groener* is misplaced. Just because *Groener* involved influence peddling does not mean that influence peddling is the only type of conduct at which the statute is aimed. Three other subsections, ORS 244.040(2), (3) and (5), provide:

"(2)   No public official or candidate for office or a member of his household shall solicit or receive, whether directly or indirectly, during any calendar year, any gift or gifts with an aggregate value in excess of $100 from any single source who could reasonably be known to have a legislative or administrative interest in any governmental agency in which the official has any official position or over which the official exercises any authority.

"(3)   No public official shall solicit or receive, either directly or indirectly, and no person shall offer or give to any public official any pledge or promise of future employment, based on any understanding that such public official's vote, official action or judgment would be influenced thereby.

"* * * * *

"(5)   No person shall offer during any calendar year any gifts with an aggregate value in excess of $100 to any public official or candidate therefor or a member of his household if the person has a legislative or administrative interest in a governmental agency in which the official has any official position or over which the official exercises any authority."

Inasmuch as these provisions expressly cover influence peddling, it seems highly unlikely that the legislature intended "use" as it is employed in ORS 244.040(1) to deal exclusively with that kind of conduct as well. More than likely, ORS 244.040(1) was intended to be a broad catch-all provision covering many types of unethical conduct.

■     In ORS 244.010(1), the legislature declared the policy of the Oregon Government Ethics Law:

"The Legislative Assembly hereby declares that a public office is a public trust, and that as one safeguard for that trust, the people require all public officials to adhere to the code of ethics set forth in ORS 244.040."

Labeling public office as a public trust was no accident. It was intended, in a general way, to define the limits of acceptable behavior. One's duty with respect to a public trust, or any

other kind of trust for that matter, must be in accordance with the highest standards the law can impose.

Accordingly, we must give "use" the meaning which best effectuates the declared policy. We can best do that by giving it its common and ordinary meaning. *See James v. Carnation Co.,* 278 Or 65, 72-73, 562 P2d 1192 (1977). As the Supreme Court stated in *Camenzind v. Freeland Furniture Co.,* 89 Or 158, 181, 174 P 139 (1918), the ordinary dictionary definition of "use" is "to make use of; to avail oneself of * * *."

Petitioner clearly availed himself of his position in purchasing the automobile. It was only by reason of his employment in a position that he was aware of the opportunity, and it was only because of his position that he was able to use SAIF as his agent. In other words, but for his position, he would have been unable to purchase the car and thus to obtain a personal financial gain. To interpret "use" otherwise would effectively make waste paper out of the statute. Therefore, we conclude that OGEC's interpretation of the statute was correct.

Petitioner raises a number of other arguments which merit only a brief response. First, he contends that his due process and equal protection rights were violated as a result of the substitution of a "biased" hearings officer—a former Chief Justice of the Oregon Supreme Court—midway through the proceedings, the failure to adjudicate his case in a speedy manner and the selective enforcement of the ethics code against him. We have reviewed the record and find the contention unpersuasive.

Second, he argues in connection with his assertion that he did not "use" his position, that ORS 244.040(1) is impermissibly vague and overbroad. In *Groener v. Oregon Gov't Ethics Comm., supra,* we rejected a challenge to ORS 244.040(1) on vagueness grounds, because we concluded that the statute does not require people of common intelligence to guess at its meaning and because ORS 244.280 provides a procedure by which a public official can obtain a ruling on proposed conduct which is binding on the commission. 59 Or App at 469-70. *See also Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980). With respect to petitioner's overbreadth argument, we do not believe that ORS 244.040(1)

reaches conduct that may not be prohibited. *See State v. Blocker,* 291 Or 255, 630 P2d 824 (1981).

■ Third, petitioner contends that OGEC is estopped from asserting that his conduct violated the statute, because he sought legal advice from SAIF's staff attorney. In this case, the attorney was authorized to handle SAIF's legal work, not give private legal advice. Clearly, his opinion with respect to the propriety of petitioner's car purchase exceeded the scope of his authority. The government cannot be estopped by whatever he told petitioner. *See City of Molalla v. Coover, et ux,* 192 Or 233, 235 P2d 142 (1951).

■ Lastly, petitioner asserts that the commission erred in its assessment of the fine that was imposed. ORS 244.360 requires the commission to order a public official who has financially benefited himself to forfeit twice the amount that he realized from the violation. There is substantial evidence in the record to support the commission's determination that petitioner derived a financial benefit of $1,287.70. Twice that amount equals $2,575.40, the amount of his penalty he was ordered to forfeit.

Affirmed.

**BUTTLER, J.,** dissenting.

Although I concur generally in the dissent of Warren, J., I write separately to summarize my concern about the majority's interpretation of the relevant statute and the effect its interpretation may well have on public officials.

First, the majority holds that the phrase "use his official position or office" is the equivalent of, "by virtue of his official position or office." I think that is wrong and may lead to absurd results. The word "use" as employed in ORS 244.040(1), I think, means active, not passive, use of official position. Here, petitioner did obtain a financial benefit by virtue of his position; he did not, however, actively assert his official position or authority in order to gain that advantage.

Second, it is at least questionable whether the legislature intended to proscribe the gaining of some benefit by a public official simply by virtue of his position when the agency of which he is an official loses nothing, the taxpayers lose

nothing and no one is influenced, or attempted to be influenced, by his passive acceptance of the benefit. For examples: Would it make a difference here if the agency offered the add-on to petitioner in order to retain its fleet discount? Or if the agency would obtain a better price by having its employes' add-on for their personal use? Suppose the agency employes were encouraged to use its copy machine, paying the agency its cost (or more) but substantially less than a member of the public would be required to pay for copies from a commercial vendor?

Without intending to open the floodgates, suppose a judge makes an insurance claim through his long-time agent friend, who knows he is a judge. Must the judge question the insurer, which pays the claim as submitted, to be sure that he is not getting a private benefit because of his official position? If the judge negotiates with an automobile dealer, with whom he has dealt for years and who knows he is a judge, must he not bargain as hard as he did when he was in private practice? Must he voluntarily pay more than the price he reasonably believes he can negotiate, because he fears that he may be accused of getting a better price by virtue of his official position?

The consequences of the majority's reading of the statute are endless—so much so that public officials are very likely to become so timorous as to fit Robert Burn's description of a mouse on turning her up in her nest with the plough in November, 1785:

"Wee, sleekit, cowerin', timorous beastie, O, what a panic's in thy breastie!"[1]

Because I think the majority's interpretation of the statute is wrong and is likely to have unintended, unnecessary and unwise consequences in its effect on public officials, I dissent.

Joseph, C. J. and Warren, J., join in this dissent.

**WARREN, J.,** dissenting.

I think that the majority's interpretation of ORS 244.040(1) is unreasonable and incorrect and fails to accord

---

[1] Robert Burns, "To a Mouse."

any recognition to the intent of the legislature in enacting the Code of Ethics and related statutes. The court should interpret this statute to proscribe only the actual or attempted exercise of the *power and influence* of an official position and the execution of the duties and responsibilities of a public office in order to achieve an improper financial gain. This interpretation finds support in the language of the statute, its statutory context, the legislative history and the experience of other jurisdictions in dealing with the same problem. I would reverse, because I think that OGEC did not establish that petitioner used his official position for financial gain. Accordingly, I dissent.

The parties assert different definitions of "use." The majority adopts a more inclusive definition, "to avail oneself of," stating, "but for his job, [petitioner] would have been unable to purchase the car * * *." I would adopt a less inclusive definition which would result in an ethics violation only when the power or influence which a public official has by virtue of his public office is employed for the purpose of obtaining a private gain. To support its interpretation, the majority states that statutory terms should be given their "common and ordinary meaning." That may be so if a statute is clear and unambiguous; however, the judicial task is not so simple when a term is susceptible to two or more interpretations. Our responsibility in construing a statute is to give effect to the intention of the legislature. ORS 174.020.

> "* * * We * * * look to the legislative intent, the logical form of the statute and to the legislative policy as expressed in other statutes to resolve the ambiguity. * * *" *Sager v. McClenden,* 296 Or 33, 40, 672 P2d 697 (1983).

The majority's resort to *Camenzind v. Freeland Furniture Co.,* 89 Or 158, 181, 174 P 139 (1918), to support a broad definition of "use" in this case, is unpersuasive.[1] In that case,

---

[1]The majority selectively quotes from the several definitions of "use" cited in *Camenzind.* The definitions of "use" quoted in *Camenzind* are as follows:

"* * * In the New Standard Dictionary the primary meaning of the word 'use' is said to be:

" 'To employ for the accomplishment of a purpose; make use of; as, to use tools.'

the court interpreted a phrase in the Employers' Liability Act, which reads:

> "[A]ll owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or to the public, *shall use* every device, care and precaution which it is practicable to *use* for the protection and safety of life and limb * * *." 89 Or at 166. (Emphasis supplied.)

In that context, the meaning of the term "use" is clear and unambiguous, and it was appropriate to apply a broad definition. The interpretation of "use" in that case is not relevant to this case which construes an entirely different statute. Reference to the definition applied in *Camenzind* cannot be made to avoid our obligation to construe the term in its statutory context. As the court stated in *James v. Carnation Co.,* 278 Or 65, 74, 562 P2d 1192 (1977):

> "* * * [I]t is not necessarily required that the same phrase have the same meaning when it is used in different statutory contexts. * * *"

The language of ORS 244.040(1) supports the interpretation of "use" which I propose. The statute lists "salary, honoraria or reimbursement of expenses" as the only items of financial gain which a public official may "use" his official position or office to obtain. It is clear that an official salary is paid precisely for a public official's exercising the influence and power and executing the duties and responsibilities of his official position. People are commonly held deserving of honoraria because of the prestige of their office; it is the power and influence of their official positions which earn them honoraria. Likewise, a reimbursement of expenses is justified

---

"Webster defines the word thus:

" 'To make use of; to avail one's self of; to employ.'

"The Century Dictionary says that the term primarily means

" 'To employ for the attainment of some purpose or end; avail one's self of.' " 89 Or at 181.

*Webster's Third New International Dictionary,* 2523 (1976) defines "use": "to put into action or service; employ; exercise." I would apply this definition to the statute to require OGEC to prove that a public official exercised the power and influence of his official position for financial gain to establish a violation of the Code of Ethics.

only if the expenses are incurred in executing the duties and responsibilities of a public office. The listing of these three terms indicates the legislature's intent that "use" be given a more narrow meaning. The legislature did not intend to classify as ethical violations incidental instances of financial gain which may accrue to a public official by reason of his working in a particular office which do not involve the actual or attempted exercise of the power and influence of an official position.

That this is the legislature's intent is borne out by analyzing the other provisions of ORS 244.040. ORS 244.040(2) prohibits the solicitation and receipt of gifts from sources "who could reasonably be known" to be interested in an agency in which the official holds a position or over which he exercises authority. ORS 244.040(3) prohibits soliciting, receiving, offering or giving a promise of future employment to an official to influence his vote, action or judgment. ORS 244.040(4) prohibits an official's using confidential information obtained through his position for personal gain. ORS 244.040(5) prohibits the offer of gifts by persons who are interested in an agency in which the official holds a position or over which he exercises authority. As I read those provisions, I conclude that the purpose of ORS 244.040 is to prevent public officials from using, attempting to use or appearing to use the power or influence of their office to obtain financial gain. It is also intended to prevent others from offering financial gain to public officials. Otherwise stated, I believe that the evil sought to be avoided is the actual or apparent misuse of the power and influence inherent in public office for private advantage.

ORS 244.040(1) prohibits a type of conduct which is not covered by the other provisions. It proscribes serious ethical violations by which an official profits through employing the power of his official position. One example of conduct clearly covered by subsection (1) and not covered by the other provisions of the statute is an official's corruptly awarding a public contract to a company in which he has a financial interest. Another example is a legislator's accepting a bribe to influence his vote. Contrary to the majority's assertion, my interpretation of ORS 244.040(1) does not "effectively make waste paper of the statute."

Examples of the type of conduct which ORS

244.040(1) is intended to prohibit are found in two Oregon cases. One is *Groener v. Oregon Gov't Ethics Comm.*, 59 Or App 459, 651 P2d 736 (1982), which the majority discusses. The other is *In the Matter of Royce Pierce, Mayor and City Councilor, City of Lakeside* (OGEC order, June 17, 1982). OGEC concluded that Pierce had violated ORS 244.040(1) by using the influence of his positions to obtain from a subordinate, the city recorder, two gas company credit cards for his personal use. The city recorder had expressed reservations about providing the cards to Pierce. The unwritten policy of the city was that the cards were to be used only for city business. Although Pierce reimbursed the city for the expenses that he charged, his gain was the opportunity to defer payments for several months. In that case, Pierce used his office for financial gain by exercising the power and influence of his official positions to create an opportunity for personal gain. His actions were prohibited by ORS 244.040(1), even though his gain was not received in exchange for benefit to another, because they involved an abuse of the public trust. These cases are examples of the kind of conduct that I think ORS 244.040(1) is intended to prohibit, the exercise of the power and influence of an official position for personal gain.

OGEC did not show that petitioner used his official position, in the sense that I interpret the term, by purchasing the car. It was not part of his official responsibilities to purchase vehicles for SAIF, nor did he exercise the influence of his position by dealing with the seller in order to obtain a reduced price.[2] The case would be different had petititoner, for example, promised or implied to the dealer that he would obtain an exceptional rate for insurance coverage in exchange for a good deal on a car. Petitioner did not exercise the power and influence of his position, but merely took advantage of an

---

[2] The majority suggests that petitioner had a significant role in orchestrating SAIF's purchase of the vehicle by its flowery statement that "[p]etitioner was a member of the senior management group which gave its blessing to the plan." The senior management group, of which petitioner was a member, only endorsed the recommendation of the chief financial officer and vice-president that SAIF purchase a fleet of cars instead of continuing to lease cars. It appears from the record that the final decision to purchase the cars was made by SAIF's board of directors, of which petitioner was not a member. Petitioner did not participate at all in soliciting bids, awarding the contract, or in any of the dealings with the seller. Neither is there any evidence in the record that petitioner used the influence of his position to persuade any subordinates at SAIF to assist him in ordering his car.

opportunity which, apparently, would have been made available to any employe, of whatever status, of SAIF.[3]

My interpretation of the statute also finds support in its legislative history. It is significant to note that the Code of Ethics was enacted along with other statutes in an attempt to deal with the problem of "conflicts of interest" on the part of public officials and government employes. The bill was considered by the Senate Subcommittee on Conflict of Interest. "Conflict of interest" connotes a tension or incompatability between a personal interest and the public interest which an official must serve. By enacting ORS 244.040(1), the legislature intended to interdict a public official's personal financial gain when its achievement would interfere with his impartially serving the best interests of the public. There is absolutely no indication in the record that petitioner's decision to purchase a car as an "add-on" could interfere with his executing his official responsibilities and serving the public as an actuary for SAIF.

Other public bodies have identified and attempted to deal with types of unethical conduct similar to that covered by ORS 244.040. It is clear from the legislative history of this statute that the legislature solicited and considered such information from other jurisdictions. The experience of these other bodies in identifying the offending unethical conduct

---

[3]The chief financial officer and vice-president of SAIF, who was responsible for the fleet purchase, testified:

"Q. * * * Who else would've been eligible to get an add-on, in your judgment, a the time that Mr. Davidson did?

"A. We would've considered adding for anyone who might've made --- might've asked.

"Q. Did you put up a notice on a bulletin board and say --- anybody that wants to get a car at fifty-five hundred dollars for a station wagon can get one, for all SAIF employes?

"A. (No).

"Q. Well, was there any limit, I mean is the entry-level clerk down in payroll, would she or he had been eligible to get an add-on?

"A. Had they come and asked me, I would like a unit, I'd like to add it on, I'm sure we would've done it."

It bears mention that defendant did not initiate conversation concerning the purchase. He was approached by another vice-president, who recommended the opportunity to him.

and drafting and interpreting statutory language to deal with it is helpful to our determining the legislature's intent.

A significant study was produced by the Association of the Bar of the City of New York, entitled *Conflict of Interest and Federal Service* (1960) (hereinafter cited as REPORT). This study considered the types of unethical conduct which should be prohibited for federal employes and drafted a statute on which the federal conflict of interest law is based. Regarding abuse of office, the study discussed several actual instances of unethical conduct which a statute ought to prohibit. These included a presidential advisor's "using his White House influence to persuade the [Reconstruction Finance Corporation] to grant certain loans"; a Major General and a President's military aide's abusing his White House position by "accepting gifts from favor seekers"; a Secretary of the Air Force's recommending "the services of a firm in which he was a partner to certain companies doing business with the military departments, including the Air Force"; the chairman of the ICC's attempting "to have certain railroads give a contract to a company with which he apparently desired to assume a position upon leaving government employ"; the Public Building Commissioner's soliciting business for a firm of consulting engineers in which he retained a partnership interest; and a president's chief aide's receiving "gifts from a manufacturer who had matters pending in federal agencies" when the aide "admitted that he had communicated with agency officials on matters involving the manufacturer." REPORT at 124-29.

The study later identified the unethical conduct involved in the use of public office for personal gain as follows:

"* * * The essential concept is that the government employee should not, in his dealings with persons who have a direct relationship with his job and his agency, *use the power or authority of his office* to induce them to provide him or another with something of economic value. * * *" REPORT at 223. (Emphasis supplied.)

The statutory provision which the study drafted to deal with this type of unethical conduct reads:

"Except in the course of his official duties or incident thereto, no Government employee shall, in his relationships with any person specified in the succeeding sentence, *use the*

*power or authority of his office or position,* within the Government in a manner intended to induce or coerce such other person to provide such Government employee or any other person with any thing of economic value, directly or indirectly. This section shall apply to relationships with any person, or any officer or director of such person, from whom such Government employee, if he were a regular Government employee, would be prohibited by section 6(b) from receiving a gift." (Emphasis supplied.)

Section 6(b) prohibits a government employe from receiving a gift from a person who:

"(1)   has or is seeking to obtain contractual or other business or financial relationships with such employee's agency; or

"(2)   conducts operations or activities which are regulated by such employee's agency; or

"(3)   has interests which may be substantially affected by such employee's performance or nonperformance of official duty." REPORT at 290-91.

It does not appear that this study was before the legislature, but I would interpret ORS 244.040(1) to have the same effect and to prohibit exercising the power, influence or authority of a public office to obtain a financial gain.

Several other states have or had Codes of Ethics which contain language similar to ORS 244.040(1).[4] Other states' statutes are worded differently and in ways more explicitly than prohibiting "use" of public office for financial gain.[5] The experience of some of these states is helpful in interpreting ORS 244.040(1).

A New York appellate court in *Hanley v. Wickham,* 32 AD 2d 680, 299 NYS2d 745 (1969), found a violation of its Code of Ethics in a milk and food inspector's falsification of reports and records. The court held that:

---

[4]Fla. Stat. § 112.313(3) (1973); N.Y. Public Officers Law § 74(3)(d) (McKinney Supp 1984); Pa. Stat. Ann. Legislature Law § 143.4(3) (Purdon 1969); Tex. Stat. Ann. Article 6252-9 § 3(c) (Vernon 1970), *repealed* 1973; Wash. Rev. Code Ann. § 42.21.030 (1972).

[5]Cal. Gov't Code § 8920 (West 1980); Fla. Stat. Ann. § 112.313(6) (West 1982); Hawaii Rev. Stat. § 84-11 (1976); Tex. Stat. Ann. Article 6252-9b § 8 (Vernon Supp 1984).

"* * * petitioner's misconduct * * * involved *using the power of his position* for his own benefit at the expense of store owners and insurance companies and failing to take proper steps to destroy condemned food which could be dangerous to the health if consumed." 32 AD 2d at 681. (Emphasis supplied.)

In that case, the court interpreted the statutory language "no officer * * * should use or attempt to use his official position to secure unwarranted privileges or exemptions for himself or others,"[6] to prohibit acts which involve the exercise of the power and influence of an official position or failing to execute the duties of a public office, in exchange for private gain. The statute prohibits a derogation of duty for personal gain which involves a conflict between an official's responsibilities as a public trustee and his personal financial interests.

In *State v. Rou,* 366 So 2d 385 (Fla 1978), the Florida Supreme Court held that its Code of Ethics was unconstitutionally vague. Fla. Stat. § 112.313(3) (1973), provided:

"No officer * * * shall use, or attempt to use, his official position to secure special privileges or exemptions for himself or others, except as may be otherwise provided by law." 395 So 2d at 1245.

The legislature amended the statute to read:

"No public officer or employee of an agency shall *corruptly use* or attempt to use his official position or any property or resource which may be within his trust, or perform his official duties, to secure a special privilege, benefit, or exemption for himself or others. * * *" Fla. Stat. Ann. § 112.313(6) (West 1982). (Emphasis supplied.)

*Tenney v. State Comm'n on Ethics,* 395 So 2d 1244 (Fla App 1981), held that adding "corruptly" cured the vagueness, because that word was statutorily defined as:

"* * * *done with a wrongful intent* and for the purpose of obtaining, or compensating or receiving compensation for, *any benefit resulting from some act or omission of a public servant which is inconsistent with the proper performance of his public duties.*" Fla. Stat. Ann. § 112.312(7) (West 1982). (Emphasis supplied.)

The addition of "corruptly" to modify "use" gave adequate

---

[6]N.Y. Public Officers Law § 74(3)(d) (McKinney Supp 1984).

notice of prohibited conduct. We should construe statutes to preserve their constitutionality. *Megdal v. Board of Dental Examiners,* 288 Or 293, 297, 605 P2d 273 (1980). This can be accomplished by interpreting "use" to require the exercise of an officer's power or responsibilities for his private benefit in a way which conflicts with the proper performance of his public duties.

The Texas legislature enacted a Code of Ethics which read, in pertinent part:

> "No officer or employee of a state agency, legislator, or legislative employee shall use his official position to secure special privileges or exemptions for himself or others, except as may be otherwise provided by law." Tex. Stat. Ann. Article 6252-9 § 3(c) (Vernon 1970).

That provision was repealed and replaced with this language:

> "No state officer or state employee should intentionally or knowingly solicit, accept, or agree to accept any benefit *for having exercised his official powers or performed his official duties* in favor of another." Tex. Stat. Ann. Article 6252-9b § 8(e) (Vernon Supp 1984). (Emphasis supplied.)

It would appear that the Texas legislature attempted to be more specific as to what it originally meant by "use his official position" by enacting the language "having exercised his official powers or performed his official duties * * *."

I have reviewed the cases and statutes from other jurisdictions and associations to make the point that in every case, both in Oregon and in other states with similar statutory languge, in which a violation of the Code of Ethics was found, a financial gain was received, directly or indirectly, for the officer's exercise of the power and influence of his official position, or executing or failing to execute the duties and responsibilities of a public office. No case has extended liability, as would the majority, to a situation in which an official received a financial gain from conduct which did not involve the exercise of the power and influence of an official position.

OGEC did not establish that petitioner's ordering the car as an add-on involved the exercise of the power and influence of his position or his executing the duties and responsibilities of his public office. By finding a violation of

ORS 244.040(1), OGEC interpreted the statute incorrectly, in a manner which is overbroad in that it includes conduct which is not unethical and which does not implicate a conflict between petitioner's official responsibilities and duties and his private interest. For these reasons, I would reverse its order.

Joseph, C. J., and Buttler, J., join in this dissent.