Submitted January 22, affirmed September 18, 2013

BLUE IGUANA, INC.,
dba Blue Iguana Mexican Restaurant & Cantina,
*Petitioner,*

*v.*

OREGON LIQUOR CONTROL COMMISSION,
*Respondent.*

Oregon Liquor Control Commission
OLCC09V035, OLCC09V035A, OLCC09V035B;
A145868

310 P3d 720

Michael Shurtleff argued the cause for petitioner. With him on the brief were Michael Mills and Mills Jacobson Halliday, PC. With him on the reply brief was Mills Jacobson Halliday, PC.

Christina M. Hutchins, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

The Oregon Liquor Control Commission (OLCC) penalized petitioner, a licensee, for allowing persons who did not have legally required certification as private security professionals to act in that capacity on petitioner's premises during an event in November 2008. At a subsequent contested case hearing, petitioner argued that the certification requirement did not apply because the event in question met all of the criteria for an exemption from the certification requirement. In rejecting that argument, OLCC ruled that one of the requirements for exemption is that it applies only at an "organized event" and the alleged offense did not occur during one. OLCC also rejected petitioner's alternative arguments: first, that the agency could not enforce the statute in the absence of formally promulgated administrative rules defining what an "organized event" is; and second, if the agency could define "organized event" in the process of deciding contested cases, the event in question met that definition. Petitioner seeks judicial review. We conclude that the exemption applies only at organized events and that OLCC may (and did) define "organized event" without formal rulemaking. We do not reach petitioner's argument that the event at which the offenses occurred was, in fact, an organized event, because petitioner first advanced that argument in its reply brief. We therefore affirm.

The following facts from the OLCC order are, unless otherwise noted, unchallenged and are, therefore, the facts for purposes of our judicial review. *Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 134, 903 P2d 351 (1995). The challenged finding is reviewed for substantial evidence, that is, we accept the agency's finding if "the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c).

Petitioner, Blue Iguana Mexican Restaurant & Cantina, holds an OLCC license. In 2008, inspectors went to that establishment to conduct a compliance check and discovered that eight persons wearing yellow shirts marked "Security" were checking IDs and patting down patrons before allowing them to enter. The security professionals also told an OLCC inspector that their security duties included, if

necessary, breaking up fights and asking unruly patrons to leave. None of the security professionals had "Private Security Identification" cards issued by the Department of Public Safety Standards and Training (DPSST). Of the eight security professionals interviewed, seven were subsequently convicted of violating ORS 181.991(1)(b), which prohibits a person from providing "private security services as a private security professional without being certified to do so" by DPSST. Petitioner, in turn, was cited for violating OAR 845-006-0347(3) (11/07/08), which prohibits an OLCC licensee from permitting "any activity that violates a criminal statute."[1] After a contested case hearing, OLCC concluded that petitioner had violated the rule by permitting uncertified security personnel to work on petitioner's premises; for that violation, OLCC imposed a license suspension of 74 days, with the proviso that petitioner could reduce the suspension to 22 days by paying a civil penalty of $8,580.

On judicial review, petitioner renews the arguments it made at the administrative hearing, focusing on a specific part of the hybrid statutory and regulatory scheme governing the use of security personnel at premises licensed by OLCC— in particular, on an exception to the requirement that such personnel be certified. Under that scheme, a private security professional must be certified by DPSST. ORS 181.873(1)(a). A person is a private security professional if he or she performs specified functions, including "[c]ontrolling access to premises being protected." ORS 181.870(8)(d).[2] Providing private security services as a private security professional without a license is a Class A violation. ORS 181.991(1)(b).

---

[1] OAR 845-006-0347(3) (11/07/08) provides, in part:

"Unlawful Activity:

"(a) No licensee or permittee will permit any unlawful activity on the licensed premises or in areas the licensee controls that are adjacent to or outside the premises. Unlawful activity includes any activity that violates a criminal statute. Examples include, but are not limited to, crimes relating to prostitution, public indecency, controlled substances and gambling."

The parties agree that ORS 181.991(1)(b) is a criminal law; we therefore do not address that question.

[2] ORS 181.870 and ORS 181.871 have been amended since the alleged offense, hearing, and order in this case occurred. Or Laws 2011, ch 516, § 1; Or Laws 2012, ch 28, §§ 1-2. References throughout this opinion are to the 2007 versions that were operative when the alleged offense, the hearing, and the order in this case occurred.

However, there is an exemption from the certification requirement for a "person performing crowd management, * * * including * * * a person employed for the purpose of age verification by a licensee of the Oregon Liquor Control Commission." ORS 181.871(1)(k). (For the purpose of clarity, we will refer to that exemption as the "general crowd management exemption.") However—and herein lies the dispute—in order to qualify for the general crowd management exemption, uncertified security personnel must also meet the following more specific requirements:

"The [general crowd management] exemption provided by [ORS 181.871](1)(k) applies only:

"(a) If there is at least one person on-site who is certified or licensed under ORS 181.878 for every 10 or fewer uncertified persons performing [crowd management or guest services] described in subsection (1)(k) of this section;

"(b) If any enforcement action, * * * other than incidental or temporary action, is taken by or under the supervision of a person certified or licensed under ORS 181.878; and

"(c) During the time when a crowd has assembled for the purpose of attending or taking part in an organized event, including pre-event assembly, event operation hours and post-event departure activities."

ORS 181.871(2).

OLCC's disputed enforcement action in this case was not based directly on a violation of ORS 181.871; violations of that statute were prosecuted by DPSST. Rather, the sanction was imposed on petitioner for violating an OLCC rule, OAR 845-006-0347(3), which, as noted, prohibits an OLCC licensee from permitting "any activity that violates a criminal statute"—*i.e.*, ORS 181.871.

The parties agree that petitioner employed uncertified security personnel for crowd management functions. They disagree about whether those personnel had to meet all of the additional requirements under ORS 181.871(2), in particular, the "organized event" requirement in subsection (2)(c); if so, whether OLCC could impose its rule prohibiting licensees from using uncertified security personnel in the

absence of administrative rules defining "organized event"; and, if so, whether OLCC did so properly in this case.

In its first assignment of error, petitioner asserts that crowd management security personnel who qualify under ORS 181.871(1)(k) (the general crowd management exemption) need not be certified if *either* the additional requirement in ORS 181.871(2)(a) applies *or* the requirements in subparagraph (2)(b) *and* (c) apply. In other words, according to petitioner, if the ratio of uncertified to certified persons is at most ten-to-one (subparagraph (a)), then the exemption applies; if not, the exemption applies nonetheless if enforcement action is taken under the supervision of a certified person (subparagraph (b)), and the action is taken at an organized event (subparagraph (c)). Petitioner asserts that its security personnel met the general requirement for the crowd management exemption set out in ORS 181.871(1)(k), and it also met the further requirement in 181.871(2)(a), and that meeting those two requirements sufficed to bring it within the exemption. Petitioner explains:

> "Note that (2)(a) stands alone and is not connected to (b) and (c) with the conjunctive 'and,' while (b) and (c) are connected by an 'and.' This indicates that (a) stands independent of (b) and (c) in modifying the exception, while (b) and (c) must be read together as a further modifier. If the legislative drafters * * * had meant that all three, (a), (b) and (c) apply to a person employed for 'crowd management,' 'guest services' or purposes of 'age verification,' they would have connected (a) to (b) and (c) with an 'and.'"

OLCC, for its part, argues that the three subsections in ORS 181.871(2) are cumulative, that is, to qualify for the exemption, the security professionals had to be crowd managers under ORS 181.871(1) and, in addition, meet all three of the requirements in ORS 181.871(2), including the "organized event" requirement.

We agree with OLCC. The short and sufficient refutation of petitioner's reading of the statute is: That is not how the English language works. If, for example, a speaker asserts that a decent diet "includes the following: fat, protein, and carbohydrates," no one would interpret the assertion to mean that eating fat alone is one way to have a decent diet

while eating protein and carbohydrates is another—that, in other words, no carbohydrates are necessary, so long as there is fat. As the online version of the *Form and Style Manual for Legislative Measures* instructs, "In a *series* of subunits following a colon, use a semicolon at the end of each subunit if the grammatical structure or the sense of the provision requires the use of either 'and' or 'or' preceding the last subunit." Legislative Administration Committee, *Form and Style Manual for Legislative Measures*, 5 (2012), http://www.lc.state.or.us/pdfs/form-stylemanual (emphasis added). To achieve the meaning that petitioner advocates, the drafters would have used the following formulation for ORS 181.871(2):

"The exemption provided by subsection (1)(k) of this section applies only:

"(a)   If there is at least one person on-site who is certified or licensed under ORS 181.878 for every 10 or fewer uncertified persons performing the services described in subsection (1)(k) of this section; or

"(b)(i)   If any enforcement action * * * is taken by or under the supervision of a person certified or licensed under ORS 181.878; and

"(ii)   During the time when a crowd has assembled for the purpose of attending or taking part in an organized event * * *."

We consequently reject petitioner's first assignment of error.

In the alternative, petitioner argues that, even if the requirements for exemption from certification include working at an "organized event," that requirement cannot be enforced because there are no administrative rules defining what an "organized event" is. OLCC, for its part, responds that definitional rules are not necessary; rather, it can define the term in orders resolving contested cases, and it has done so with respect to the term at issue here.

Since *McPherson v. Employment Division*, 285 Or 541, 591 P2d 1381 (1979), and *Megdal v. Board of Dental Examiners*, 288 Or 293, 605 P2d 273 (1980), Oregon courts have engaged the question of when a regulatory or licensing agency, operating as it must within a statutory authorization,

can take enforcement action in the absence of formally promulgated administrative rules. The Supreme Court's current answer to that question builds on *Megdal* and *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980). In *Megdal*, the issue before the board of dental examiners was whether the board could discipline a dentist for "unprofessional conduct" when that statutory term had not been defined by rules. 288 Or at 295. The court held that the term itself, as well as the statutory scheme of which it was a part, determined whether prior rulemaking was required. If a term is "uniformly or widely recognized in the particular" subject of regulation, "its application would depend not on interpreting the law or making rules but on finding what the existing standards in fact are." *Id.* at 304. In *Springfield*, amplifying and simplifying *Megdal*, the court referred to such terms as "exact," and gave examples such as "21 years of age, male, 30 days." 290 Or at 223. Agencies do not need to promulgate rules defining such terms. *Id.* (exact terms "requir[e] only factfinding by the agency"). *Megdal* identified a second class of terms: those "intended to express the legislature's own * * * standard, though in very general terms." 288 Or at 304. *Springfield* referred to those terms as "inexact," because they were "less precise" than exact terms, and held that they could be defined and applied "by order or by rule." 290 Or at 224. Finally, *Megdal* identified terms that indicated "a legislative assignment to the agency to make new rules," that "cannot be applied without prior rulemaking." 288 Or at 305. In *Springfield*, those terms are, for obvious reasons, called "delegative." 290 Or at 228. Examples include "'good cause,' * * * 'fair,' 'unfair,' 'undue,' 'unreasonable,' or 'public convenience and necessity.'" *Id.* (quoting *McPherson*, 285 Or at 550).

In *Coffey v. Board of Geologist Examiners*, 348 Or 494, 498 n 5, 235 P3d 678 (2010), the Supreme Court summarized developments since *Springfield* and, in the process, established the current method for determining whether a regulatory or licensing agency can enforce standards in the absence of administrative rules:

"In *Springfield* * * *, this court, relying on earlier cases, including *Megdal*, concluded that it would determine the nature and scope of agency authority delegated by statutes,

including whether a statute required agency rulemaking in advance of adjudication, by examining three types of statutory terms, 'exact,' 'inexact,' and 'delegative.' *Id.* at 223 (citing *McPherson*[], and *Megdal*); *see also Ross v. Springfield School Dist. No. 19,* 294 Or 357, 367-68, 657 P2d 188 (1982) (discussing the three categories of statutory terms outlined in *Springfield* * * * and distinguishing *Megdal*)."

The court continued:

"Whether an agency is required to promulgate rules in advance of an adjudication is 'a matter of statutory interpretation.' *Trebesch v. Employment Division,* 300 Or 264, 267, 710 P2d 136 (1985); *see also Forelaws on Board v. Energy Fac. Siting Council,* 306 Or 205, 214, 760 P2d 212 (1988) ('If an agency is required to adopt a rule through rulemaking proceedings, that requirement must be found through an analysis of the specific statutory scheme under which an agency operates and the nature of the rule that the agency wishes to adopt.' (Citation omitted.)). When no statute expressly requires an agency to make rules before selecting a disciplinary sanction, a reviewing court examines the statutory text and context pertaining to the agency's delegated responsibilities regarding the disciplinary process to discern whether the legislature nonetheless impliedly intended to require the agency to make rules concerning the subject matter in question before selecting an otherwise authorized sanction.

"'In the absence of an explicit directive, the breadth and kind of responsibility delegated to the agency by the statutory term (fact-finding, applying an ambiguous law, or developing policy) will be one, but not a dispositive, factor which may indicate an implicit directive from the legislature for rulemaking. In addition, the tasks the agency is responsible for accomplishing, and the structure by which the agency performs its mandated tasks, all of which are specified in an agency's authorizing legislation, must be examined as a whole in order to discern the legislature's intent with regard to rulemaking.'

"*Trebesch,* 300 Or at 270."

*Coffey,* 348 Or at 497-99 (footnote omitted). Thus, to determine whether OLCC could penalize petitioner in this case in the absence of administrative rules defining "organized event," we need to examine the term itself and the statutory context in which it appears.

The term itself points in the direction of concluding that prior rulemaking is not necessary. As summarized above, the cases teach that prior rulemaking is required for enforcement of "delegative" terms, and those terms tend to be broad and general, such as "unprofessional conduct," "fair," "good cause," "unreasonable," or "public convenience and necessity." *Springfield*, 290 Or at 228. Such terms are a strong indication (but not a dispositive one, *Trebesch*, 300 Or at 270) that the legislature has expressed a general but incomplete statement of policy, delegating further legislative-like action to the agency. "Organized event" is not such a term. Unlike the broad, delegative terms the court has identified, "organized event" does not call on the agency to make fundamental policy judgments. Rather, it appears to us to express a completed legislative policy choice that needs definition more than elaboration.

That appearance, we conclude, is confirmed by the context in which the term appears. To reach that decision, however, we must first confront an unusual complication. Our task is to "examine[] the statutory text and context pertaining to *the agency's* delegated responsibilities regarding the disciplinary process to discern whether the legislature nonetheless impliedly intended to require the agency to make rules," *Coffey*, 348 Or at 498 (emphasis added), and to examine "the tasks *the agency* is responsible for accomplishing, and the structure by which *the agency* performs its mandated tasks, all of which are specified in *an agency's* authorizing legislation," *Trebesch*, 300 Or at 270 (emphases added). The sanctioning agency is OLCC, and the basis of the sanction is violation of an OLCC administrative rule, OAR 845-006-0347(3)(a) (quoted above, 258 Or App at 538 n 1), established under the authority of ORS 471.040 (establishing that OLCC has power to make rules). The rule prohibits a licensee from permitting a violation of criminal law. The criminal law violation of which petitioner is accused of permitting, ORS 181.991(1)(b) (providing security services without certification) and the exemption from that law-containing the term "organized event," ORS 181.871(2)(c), however, do not apply solely to OLCC licensees; they apply generally to any security personnel performing crowd management. The statutes, in fact, directly bear on the scope of

DPSST's authority to certify security professionals. We are therefore confronted with two relevant agencies and, at least potentially, two statutory contexts to consult in determining whether rules are necessary. The question thus arises: *Which* agency?

We conclude that the relevant agency whose statutory context we examine must be OLCC, despite the fact that the term "organized event" appears in a statute that deals with the regulation of private security professionals generally. The statutory term appears in the context of OLCC rules governing the regulation of OLCC licensees, drafted under the authority of a series of statutes, ORS chapter 471, dealing not with the certification of security professionals, but with the regulation of liquor. When OLCC adopted the rule prohibiting licensees from permitting criminal violations, it incorporated statutes defining criminal violations, and it did so for those statutes' use by OLCC in the performance of its statutorily imposed duty to regulate its licensees. The purpose to which the statutory phrase "organized event" is put in this and other OLCC enforcement actions thus fall squarely in the context of the legislature's regulation of alcohol providers. It is that regulatory context that provides the relevant context for the term as it is used here. Put another way, the proper focus of our inquiry is whether the legislature would have intended *OLCC* to promulgate a rule defining "organized event" when it enacted the statute that applies that term to *OLCC* licensees in ORS 181.871(2)(c).

Although OLCC has statutory authority under ORS 471.730(5) "to adopt such regulations as are necessary and feasible for carrying out the provisions" of ORS chapter 471 (regulating alcoholic liquors generally), there are very few explicit statutory requirements for rulemaking, and none deals with anything relevant to defining "organized event" or, indeed, to discipline of licensees.[3] From that fact, we infer

---

[3] ORS 471.040 (requiring OLCC rules "pertaining to natural and fortified wines as will prevent the importation and sale in Oregon of blended, rectified, adulterated, or lo-quality wines"); ORS 471.175(4) (requiring rules governing process for licensees to buy distilled liquor at discount); ORS 471.184(1) (requiring rules regarding temporary off-premises catering and food service by licensees); ORS 471.750(1) (requiring rules "governing advertising by stores operated by the commission"); ORS 471.346 (requiring rules to "develop uniform standards for minor decoy operations"); ORS 471.478 (requiring rules for "the identification of

two conclusions: first, the legislature in most areas left the decision whether to promulgate rules to the discretion of the agency; and second, the legislature knew how to require OLCC rulemaking when it chose to do so, and it did not do so with respect to defining "organized event." As a corollary, it is significant that many of the provisions in ORS chapter 471 are drafted at an extremely detailed level of specificity. ORS 471.660, for example, dealing with seizure of conveyances transporting "alcoholic liquor in violation of the law," contains nearly 500 words in eight sections, including ORS 471.660(7): "If the court orders the return of the vehicle or conveyance [used by some person other than the owner in violation of the liquor laws], the movant shall not be liable for any towing or storage costs incurred as a result of the seizure." We infer from such specificity, typically found in administrative regulations and not statutes, that, when the legislature wanted express rules, it promulgated those rules itself as legislation instead of requiring OLCC to do so as quasi-legislation.

Further, the danger of inconsistent rulings is obviated by a statute under which a licensee can enforce agency consistency in applying statutes. ORS 183.484(8)(b)(B) (providing for remand of contested case order if agency's exercise of discretion is inconsistent with "a prior agency practice, if the inconsistency is not explained by the agency"). Finally, we observe that the need for centralized rulemaking in order to ensure statewide consistency is obviated by the fact that OLCC is a centralized agency whose practice is not delegated to several local or specialized offices. Although different administrative law judges adjudicate different cases, all cases are reviewed by OLCC itself and signed by the director. In sum, although the indications of legislative intent with respect to the need for rulemaking to define "organized event" are sparse, the indications that we do find are consistent with the indications inherent in the inexact term "organized event" itself. OLCC need not promulgate rules defining that term; it can do so case-by-case.[4]

---

kegs of malt beverages sold directly to consumers who are not licensees of the commission and the signing of a receipt therefor by the purchaser").

[4] The fact that an agency has statutory discretion to promulgate rules but has no statutory *mandate* to do so prior to taking enforcement or regulatory action,

In the present case, OLCC concluded:

"The phrase 'organized event' was interpreted in *Tommy's Too* (OLCC, Final Order, 09-V-024, October 2009) as, by its terms, not applying to normal day-to-day business activities. Furthermore, as a factual matter, there was no 'organized event' in this case, as there was no special themed party or event at the licensed premises on November 7, 2008. On that night, [l]icensee was simply engaged in its regular business activity."

We take this paragraph to define "organized event," albeit obliquely, as a special occurrence such as a themed party that is not part of a licensee's normal day-to-day business activity. Our task on judicial review of this definition is to "ensure that it is consistent with the legislature's intent." *Bergerson v. Salem-Keizer School District*, 341 Or 401, 411, 144 P3d 918 (2006).

We conclude that it is. "Organized" is neither defined by statute nor, as far as we are aware, is it a term of art; we therefore presume that the legislature intended the word to have the plain and ordinary meaning that it has in common usage. *Tharp v. PSRB*, 338 Or 413, 423, 110 P3d 103 (2005). "Organized," of course, is the past participle of "organize." In ordinary parlance, to organize an event is to plan and coordinate it, noting what functions need to occur, when they need to occur, who will perform them, and so forth. This ordinary meaning is confirmed by the relevant dictionary definitions, which state that "to organize" is "to arrange or constitute into a coherent unity in which each part has a special function or relation; *** to unify into a coordinated functioning whole : put in readiness for coherent or cooperative action; *** to arrange by systematic planning and coordination of individual effort," as in the sentence, "helped to [organize] games and entertainment among the passengers ***." *Webster's Third New Int'l Dictionary* 1590 (unabridged ed 2002). An "organized" event, then, would be one showing the effect of planning or coordination. An event, again in general parlance, is an out-of-the-ordinary occurrence, as in "Our club has a forthcoming event on August 15," or "The

does not mean that it *may not* promulgate such rules, nor does it imply that promulgating rules may not be the better practice with respect to ORS 181.991(1)(b).

wedding was a significant event in his life." Again, the dictionary confirms this normal usage, defining an event, as (among other things) "a noteworthy occurrence or happening : something worthy of remark : an unusual or significant development * * *." *Webster's* at 788. We conclude, therefore, that an "organized event" is a special or noteworthy occurrence that shows the result of planning and coordination. We find nothing in the context of the statute in which the term occurs or in ORS chapter 471 that would lead us to believe that the term could mean anything else; it is, in other words, plain and unambiguous (albeit expansive). Further, petitioner has not called our attention to any legislative history that might give the term a meaning that differs from the plain meaning. Thus, OLCC's definition—again, a special occurrence such as a themed party that is not part of a licensee's normal day-to-day business activity—is consistent with (albeit not identical to) the legislature's intended meaning. The definition is therefore valid. *Bergson,* 341 Or at 411.

That conclusion leaves us with one remaining question: Is there substantial evidence in the record to support the OLCC's finding that the event where uncertified security professionals were working was *not* a special occurrence, but, rather, "its regular business activity"? Petitioner argues that there is no such evidence. However, it advances that argument for the first time in its reply brief. We will not address an argument raised at that stage of the proceedings. Because the finding of fact was stated in the OLCC's order, petitioners should have challenged it in their opening brief, and their failure to do so means that the fact in the order is the fact for purposes of judicial review. *Meltebeke,* 322 Or at 134.

Affirmed.